IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN THE MATTER OF | ) | |
| THE EXTRADITION OF | ) | No. 24-mj-01365-DLC |
| T.C. | ) | |

**EMERGENCY MOTION TO TRANSFER T.C. TO THE MASSACHUSETTS DEPARTMENT OF YOUTH SERVICES OR IN THE ALTERNATIVE TO RECONSIDER ORDER DENYING RELEASE**

Now comes T.C., a Juvenile with no prior criminal history who is an American citizen, who moves this Honorable Court for an Emergency Order for the Marshals to transfer him to the Massachusetts Department of Youth Services ("Mass DYS").

As reason therefore, the Juvenile states the following:

1. On Friday, July 12, 2024, the Marshals transferred T.C. from Manson Juvenile Institute to the Northeast Juvenile Detention Center in Newark, New Jersey ("Newark").

2. On Monday, July 8, 2024 the government filed notice that T.C. would be transferred to Newark. On Tuesday, July 9, 2024 this Court issued a decision denying T.C.'s motion for release from detention pending extradition.

3. Also on July 9, 2024 undersigned counsel Victoria Kelleher ("undersigned counsel") informed the government that the defense was in contact with Mass. DYS Commissioner Reardon regarding the potential for T.C. to be transferred to Mass. DYS. Mass. DYS is a secure facility close to Boston Federal Court where the govern-

ment is proceeding against T.C., close to T.C.'s attorneys, and close to T.C.'s family.[1] As such, it is the most natural and logical place for T.C. to be detained pending extradition proceedings in this case.

4. On July 10, 2024 undersigned counsel provided the government with confirmation from Commissioner Reardon that DYS was prepared to accept T.C.. (Exhibit A.) Counsel separately provided the government with contact information for Mass. DYS General Counsel. Moreover, undersigned counsel learned that Mass. DYS had previously contracted with the Marshals on other occasions to hold juveniles in their custody. This additional information was conveyed to the government and confirmed.

5. Also on July 10, 2024 the government confirmed that it had forwarded Commissioner Reardon's letter of confirmation to the Marshals. Undersigned counsel also requested that the Marshals not transfer T.C. to Newark until a determination regarding his possible transfer to Mass. DYS, as counsel deemed a transfer to Newark would jeopardize T.C.'s mental health as well as interfere with his right to counsel.

6. On Friday, July 12, 2024 the government provided notice that T.C. was being transferred to Newark and was on his way. Undersigned counsel contacted the Marshals to determine why they had made this decision despite the parties communications and efforts to transfer T.C. to Mass. DYS.

7. Undersigned counsel specifically spoke with John Wickham, Supervisory Deputy U.S. Marshal. He acknowledged that the Marshals previously detained juve-

---

[1] The Court wrote in its decision denying T.C.'s motion for release from detention that T.C. had no contact with his local aunt and uncle between the time of his most recent arrival in Boston and his arrest on the extradition warrant in this case. In fact, T.C. has been close to his aunt and uncle since birth, and had numerous visits and calls with them over the time period prior to his arrest.

niles in Mass. DYS but informed defense counsel that Mass. DYS was three times more expensive, and so the Marshals Office in Massachusetts Federal Court made contracts with New Jersey and Connecticut instead. The Marshals would not consider transferring T.C. to Mass. DYS purely for financial reasons.

8. Also on the same date, undersigned counsel contacted Newark to make arrangements to visit T.C. in Newark on Sunday, and was told that would not be a problem. Based on this, counsel made travel arrangements for the visit. On July 13, 2024, undersigned counsel called Newark to see if it was possible to speak with T.C. over the phone. In doing so, counsel mentioned the planned visit to Newark on Sunday and was then told an appointment was needed and that at any rate, no visits occur on Sunday -- including attorney visits. Defense counsel contacted the government who endeavored to arrange the attorney visit with the help of the Marshals, and Newark did subsequently permit the visit.

9.    Undersigned counsel met with T.C. on July 14, 2024 at Newark. He was tearful, anxious and confused about why he had been moved to Newark from Manson Juvenile Institute ("Manson"). He described having to endure more isolation at Newark due to Covid, despite having all up-to-date vaccines at Manson. He described a routine at Manson that included certain services and relationships with staff, all of which were upended for a facility which he describes as much worse.  He reported that he made numerous requests to call his lawyer at Newark, and that all his requests were denied. He fears for his safety, and was specifically told by a corrections officer that he was fortunate to be in Unit 6 because he will be assaulted on account of his race in another unit.  He reported that others in his unit are older, from age 18-21. He

said he dreads the relative isolation at Newark, as without a tablet (which was provided at Manson) he will have much less phone and video contact with his family. He produced a letter he had written himself and asked if I would provide it to the Court. That letter is attached as Exhibit B.

10. Undersigned counsel spoke with an attorney with the Newark Juvenile Public Defenders. She reported that Unit 6 is a temporary unit and T.C. will likely be moved after approximately seven days. She reported that Newark has little or no programming outside of their school curriculum, and is currently facing a lawsuit due to their failure to provide educational services to a subset of their population. She reported that Newark once had a good program but that the state failed to resource it and services dwindled. She confirmed that kids don't have tablets and are provided with three phone calls a week. She also confirmed that Newark also sometimes houses adults aged 18-21 in Unit 6.

11. A lawsuit is presently pending alleging severe sexual abuse of juveniles at the hands of the Newark prison guards.[2] While the lawsuit alleges such abuse occurred in the past, there has been no reckoning with these events, and current resource restrictions raise concerns about present conditions and level of supervision.

12. The Marshal's transfer of T.C. from Manson to Newark worsened T.C.'s conditions of confinement, and puts his mental health at risk. Not only is T.C. currently suffering as a result, but he will continue to suffer due to the relative isolation and fear of abuse. Newark is approximately a 5 hour drive one-way with traffic, making an attorney-client visit virtually impossible without an overnight stay, which is

---

[2] See, https://www.northjersey.com/story/news/essex/2024/06/27/essex-juvenile-detention-center-sued-over-alleged-sexual-abuse/74222462007/.

also virtually impossible on any semi-regular basis due to counsel's work schedule. Similarly, T.C.'s aunt and uncle, the only family he has in the area, face the same obstacles — particularly where there are no institutional visits on Sundays. T.C. will also have limited contact with his father due to the lack of relative telephone privileges.

13. Counsel asserts that Mass. DYS is resourced and provides programs and services to children in a safe and secure environment based on counsel's own experience working with the juvenile population. Counsel further argues that the transfer of T.C. from one under-resourced facility to another, i.e. from Manson to Newark, is cruel and unusual under the circumstances of this case — specifically where he is a juvenile with no prior criminal history, removed from his attorneys and family, and threatened with abuse -- and constitutes a violation of his Fifth, Sixth and Eighth Amendment rights.

14. The Marshal's objection to Mass. DYS based on expense is wholly without merit. Pursuant to 18 U.S.C. §3195 holds, "All costs or expenses incurred in any extradition proceeding in apprehending, securing, and transmitting a fugitive shall be paid by the demanding authority." Thus, all costs are to be incurred by Turkey, which has no standing to object to the cost of detention in Massachusetts, where T.C. currently faces extradition, and which is the most natural place for T.C. to be detained.

15. The detention of children under the age of 18 with those over the age of 18 is unlawful pursuant to 28 CFR § 115.14.

16. Based on all the foregoing, the defense moves this Honorable Court order that T.C. should be transferred to Mass. DYS forthwith. The defense further moves that if the Marshals are unwilling to effectuate a contract with Mass. DYS, that T.C. be

released to the care of his aunt and uncle forthwith, for all the reasons described in prior pleadings, including but not limited to the government's inability to provide T.C. with a suitable place of detention in violation of his rights.

    Respectfully Submitted,

    T.C., a Juvenile
    By his attorneys,

    /s/ Victoria Kelleher

    Victoria Kelleher
    Kelleher & Maceo, P.C.
    BBO #637908
    53 State Street
    Suite 500
    Boston MA 02109
    978-744-4126

    /s/ Martin G. Weinberg
    Martin G. Weinberg, Esq.
    BBO #519480
    20 Park Plaza
    Suite 1000
    Boston, MA 02116
    (617) 227-3700

CERTIFICATE OF SERVICE

    I hereby certify that a true copy of this document was served on all counsel of record this day, July 15, 2024, and with the United States District Court, District of Massachusetts, 1 Courthouse Way, Boston, 02210.

    /s/ Victoria Kelleher

    Victoria Kelleher