IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **IN THE MATTER OF** | ) | |
| **THE EXTRADITION OF** | ) | No. 24-mj-01365-DLC |
| **T.C.** | ) | |

**REPLY TO GOVERNMENT'S RESPONSE TO
SECOND EMERGENCY MOTION TO RECONSIDER ORDER DENYING RELEASE
LEAVE TO FILE GRANTED ON JULY 24, 2024**

  Now comes the Juvenile T.C. who replies to the Government's Response to his Second Emergency Motion to Reconsider Order Denying Release due to Serious Assault on the Juvenile in the Custody of Newark NJ and Refusal by Manson to Take Custody. Specifically, the Juvenile provides the following supplemental facts and circumstances that are relevant to the Court's Determination of the Motion:

**Supplemental Facts Supporting T.C.'s Motion for Release from Detention**

  1. T.C. has now secured GPS monitoring services provided by SCRAM, which is the largest provider of such services and has for decades contracted with probation and parole departments in every state and uses the latest technology to monitor pre-trial and post conviction defendants. The Juvenile proposes that he would agree to be fitted with SCRAM's GPS monitoring device upon discharge from Newark NJ's Youth Detention Center, would agree to home confinement and/or other restrictions ordered by the Court — such as release for work at a fixed location that could be verified by GPS monitoring with a curfew requiring that he be at the residence of his relatives, and would agree to have all GPS tracking information conveyed to the U.S Attorney's Office and/or the United States Marshals' Office. The services would be paid for pri-

vately by T.C's family via a contract with SCRAM.  A copy of the proposed contract is attached at Exhibit A.

2. T.C. has been accepted into ROCA, a community based program that employs trauma-informed services to a diverse population of at-risk young men and women, and partners with community organizations including police, probation and parole departments, medical and educational institutions, and providers of psychological services. ROCA is highly regarded by its criminal justice partners within the communities it serves. Molly Baldwin, ROCA's Founder and Chief Executive Officer, is fully apprised of T.C.'s circumstances and will provide him with in-home caseworker services, assist him with therapeutic and educational services, and engage him in other services as deemed appropriate.  T.C. would agree to sign whatever releases the Court deems necessary for oversight by the AUSA and/or the US Marshals as to T.C.'s compliance. Information pertaining to ROCA can be found here: https://rocainc.org.

3. T.C. has a close relationship with his local aunt and uncle, with whom he would reside if released.  This relationship is referenced in T.C.'s letter to the Court, Ex. B, attached to T.C.'s first emergency motion. Moreover, undersigned counsel Victoria Kelleher ("undersigned counsel") has spoken almost daily with his aunt, who has demonstrated deep concern for T.C.'s welfare based on her and her husband's relationship with him. Undersigned counsel is aware that as a young child T.C. visited his aunt and uncle in the United States. His aunt and uncle also visited T.C. in Turkey during his childhood. Since T.C. was most recently brought to the United States by his mother, T.C. visited with his aunt and uncle on several occasions, and his aunt assisted with his medical care including for his skin condition and his dental care. Both

T.C.'s aunt and uncle have made the long drive to visit with him, first in Connecticut and then in New Jersey. Should the Court release T.C. to his aunt's care, she is willing to become his legal guardian. She is also willing to write an affidavit (under seal) detailing her relationship with T.C. and her commitment to ensuring that T.C. abides by any and all conditions set by the Court and would along with T.C.s uncle undertake responsibilities as a third party trustee/de facto guardian ad litem to report any nonconformity with the conditions of release if ordered to the US Marshals or US Attorney.

4. The government asserts that T.C. was moved from Manson Youth Institute in Connecticut ("Manson") to the Newark Detention Center in New Jersey ("Newark") largely due to allegations he made in court filings. These allegations were based on the unlawful use of solitary confinement and the violations of his right to privacy as a juvenile whereby Manson released a photograph of him in prison garb to the press, along with personally identifying information. As a result of what T.C.'s counsel believes were lawful filings, Manson retaliated against T.C. by way of transfer to Newark, which took him away from enrolled programs and the relationship he had established with his caseworker, and placed him even further from his counsel and his family.

5. The government asserts that Newark's policy of housing 18-21 year olds is similar to that of Mass. DYS. Significant differences exist, however, where Mass DYS places 18-21 year olds in separate units than those under 18, as required by state and federal law. Newark, however, places them on the same unit where Timur is held, thus exposing a juvenile just weeks into his 17th year to convicted offenders two, three, and

nearly four years older. This practice violates the law and places juveniles in a facility that has proven dangerous to T.C..

      6. The government asserts that T.C.'s counsel can utilize Zoom for attorney calls on the weekend. In fact, no visits or calls are permissible for attorneys or other visitors on Sunday. Undersigned counsel has had several calls with the Supervising Social Worker, Ms. Jones, who has done her best to watch over T.C. given the circumstances he faces. However, Ms. Jones is not responsible for scheduling attorney Zoom calls. Scheduling occurs through the secretary, and counsel's prior attempts to set up Zoom meetings for T.C. and his father were unsuccessful without counsel's presence.

      7. The government asserts that residents said T.C. was arguing with other kids for using the phone too long. Undesigned counsel spoke with Supervisor Jones on July 19th, the day following the assault on T.C. regarding the circumstances of the assualt. Supervisor Jones read to undersigned counsel from the internal staff report of the incident. The report reflects that T.C. asked if he could use the phone, and was thereafter violently assaulted from behind. At no time was he argumentative with either staff or any other juvenile. Supervisor Jones again confirmed the sequence of events to undersigned counsel after review of the Government's response to T.C.'s emergency motion. Any suggestion that T.C. somehow provoked a violent assault by three older juveniles who attacked him from behind is unwarranted and unfair.

      8. Given all of the above, T.C. moves that he be released from detention in order to avoid physical assault, psychological trauma, isolation from family, and distance from counsel, all of which constitute "special circumstances" given that T.C. has not been held in an appropriate facility since his first appearance before Your Honor.

He will abide by all conditions set by the Court, including GPS monitoring, home confinement, enrollment in ROCA, educational and/or employment services, mental health treatment, and signed waivers for release of information to the US Marshals and/or the US Attorney's office.

**Supplemental Facts Supporting T.C.'s motion to Transfer to Mass. DYS**

9. The government asserts that an unknown Deputy Marshal attempted to contact Massachusetts Department of Youth Service ("Mass. DYS" or "DYS") on prior unknown dates by calling a number on DYS' website that connected to a Regional Detention Center in Dorchester, as opposed to calling the main administrative office for DYS on Washington Street in Boston. On July 10, 2024 undersigned counsel provided the government with confirmation from Commissioner Reardon that DYS was prepared to accept T.C., and separately provided the government with contact information for Mass. DYS General Counsel. This information was conveyed by the government to the U.S. Marshals the same day, as confirmed by email. As recently as July 19th, the Commissioner reported that neither she, the chief financial officer, nor DYS General Counsel had heard from the Marshals' Office concerning T.C.'s placement or the cost of such services.

10. The government asserts that the cost differential between housing a juvenile at Mass. DYS and a juvenile at either Manson or Newark N.J. is $400/day compared to $120/day.[1] This argument places the cost of services over the safety and se-

---

[1] The government previously asserted that the Marshals had decided to make contracts with Connecticut and New Jersey because those states were willing to make annual contracts rather than to require a daily fee, as was the case with Massachusetts. If so, that would mean that the Marshals were actually paying $43,800 for the year, whether or not they detain any juveniles during that time period. Of note, the current cost for Massachusetts DYS services has not been ascertained by the Marshals since 2018.

curity of the child, a concern which is not theoretical but has been demonstrated — first at Manson, where they unlawfully violated T.C.'s rights then retaliated against him for voicing concerns, and then at Newark N.J., where T.C. was assaulted and beaten, and stands to be returned to general population (given that the facility has no protective custody according to the Government's last filing) where he is vulnerable to being assaulted again. The government's argument fails to take into account the unsuitability of the conditions of his confinement in Newark's maximum security regional detention center given T.C.'s lack of criminal history, lack of exposure to violence generally, and his isolation from his family and his counsel. The government's argument further fails to take into account that the United States has an interest in assuring Turkey (as well as other countries that may request extraditions from the United States in the future) that our penal system is not characterized by violence but rather by safety and that a young juvenile facing extradition will not, as a result of his arrest in the United States, be exposed to inhumane conditions of confinement more characteristic of those occurring in countries outside the US.

11. Given all the above, T.C. moves that should the Court decide not to release him as requested, that he be transferred to Mass. DYS by the Court as authorized by 18 U.S.C. § 3184.

Respectfully Submitted,

T.C., a Juvenile
By his attorneys,

/s/ Victoria Kelleher

Victoria Kelleher
Kelleher & Maceo, P.C.
BBO #637908
53 State Street
Suite 500
Boston MA 02109
978-744-4126


/s/ Martin G. Weinberg
Martin G. Weinberg, Esq.
BBO #519480
20 Park Plaza
Suite 1000
Boston, MA 02116
(617) 227-3700


CERTIFICATE OF SERVICE

    I hereby certify that a true copy of this document was served on all counsel of record this day, July 23, 2024, and with the United States District Court, District of Massachusetts, 1 Courthouse Way, Boston, 02210.


/s/ Victoria Kelleher


Victoria Kelleher