IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN THE MATTER OF | ) | No. 24-mj-01365-DLC |
| THE EXTRADITION OF | ) | *Leave to file oversized brief* |
| T.C. | ) | *granted August 23, 2024* |

**GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF EXTRADITION
AND IN OPPOSITION TO T.C.'S MOTION TO DISMISS**

The United States respectfully submits this memorandum of law in opposition to T.C.'s motion to dismiss and in support of its request that this Court certify to the Secretary of State that the juvenile identified in court papers as "T.C." is extraditable to the Republic of Türkiye ("Türkiye") to stand trial on the offense for which Türkiye seeks his extradition.

## INTRODUCTION

T.C. is accused of recklessly injuring four people and killing one when he crashed into them while driving his mother's Porsche without a driver's license late at night on March 1, 2024 on a dark and winding road at a speed approximately 87 miles per hour above the speed limit. Within hours of the crash, T.C. and his mother fled Türkiye for the United States, via Cairo, Egypt.

Under the Treaty on Extradition and Mutual Assistance in Criminal Matters Between the United States of America and the Republic of Turkey, U.S.-Turk., June 7, 1979, 32 U.S.T. 3111 (the "Treaty"), Türkiye transmitted its request for T.C.'s extradition to the United States in April 2024. Türkiye seeks T.C.'s extradition so that he may be prosecuted for Causing Reckless Killing and Injury, in violation of Article 85 of the Criminal Code of Türkiye. After review by the Departments of State and Justice, the extradition request was transmitted to the Southern District of Florida, where T.C. was believed to be located at the time. Pursuant to a complaint for extradition and an arrest warrant issued by that court, T.C. was arrested on June 14, 2024 in Boston. Pursuant to 18 U.S.C. § 3184, this Court must now hold an extradition hearing to determine

whether to certify T.C.'s extradition to Türkiye for the Secretary of State's surrender decision.

T.C. has moved to dismiss the complaint for extradition on the grounds that T.C. has not been indicted or otherwise formally charged, in violation of Articles 1 and 7 of the Treaty. As discussed herein, T.C. misreads Articles 1 and 7, which require an arrest warrant (which Türkiye provided) but not a formal indictment. T.C. also argues that Türkiye's extradition request fails to list his nationality, despite that the request identifies his nationality in multiple places.

The Court should deny T.C.'s motion to dismiss and certify T.C.'s extradition to Türkiye for the Secretary of State's surrender decision because the requirements for such certification have been met: (1) this Court has subject matter jurisdiction to conduct the extradition hearing; (2) the Court has personal jurisdiction over T.C.; (3) the Treaty is in full force and effect; (4) the offense for which extradition is sought falls within the scope of the Treaty; and (5) there is probable cause to believe that T.C. committed this offense. *See* 18 U.S.C. § 3184; *see also, e.g.*, *In re Extradition of Taylor*, 484 F. Supp. 3d 13, 15 (D. Mass. 2020) (citing *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925)); *Zanazanian v. United States*, 729 F.2d 624, 626 (9th Cir. 1984).

## BACKGROUND

I. **Statement of the Facts[1]**

According to Turkish authorities, on the night of March 1, 2024, T.C. was driving a Porsche owned by his mother, Eylem Tok. Dkt. 70-3 at 4, 6, 19, 29, 38, 42, 44, 47, 55. In addition to T.C., there were three passengers in the car: one in the front, A.K., and two in the back, A.A. and B.A. *Id.* at 4, 6-7, 39, 40, 42-43, 45, 47. T.C.'s friend, D.O.O., was driving another vehicle, also with

---

[1] The facts in this section are taken from Türkiye's Request for the Extradition of T.C. ("Extradition Request"), a redacted copy of which was filed at Dkt. 70-1 through 70-3. An unredacted copy was filed under seal at Dkt. 12.

passengers, directly behind T.C.'s vehicle. *Id.* at 7, 38-39, 45. According to statements provided by T.C.'s friends to Turkish authorities, around 11:20 p.m., T.C. suddenly began driving his vehicle faster after they passed a speed bump in the road. *Id.* at 5, 25, 27, 29, 38. While the speed limit on the road was 30 kilometers per hour (approximately 18 miles per hour), T.C. was driving 170-180 kilometers per hour (approximately 105 to 111 miles per hour). *Id.* at 5-6, 37. The passengers requested that T.C. slow down, but he did not do so. *Id.* at 6-7, 40, 43. The passengers then put on their seat belts "just in case." *Id.* at 40. T.C.'s vehicle approached a curve in the road, and according to T.C.'s friends, T.C. was driving too fast through the bend. *Id.* at 6-7, 39-41, 43. At the same time, five individuals with all-terrain vehicles ("ATVs") had stopped on the right side of the road just past the bend, where they were trying to fix one of the ATVs that had broken down. *Id.* at 5, 13, 15-16, 18. In an attempt to avoid hitting the people on the side of the road, T.C. suddenly turned the steering wheel to the left, but the sudden turn caused the car to skid and crash into them. *Id.* at 6-7, 39-41, 43. T.C.'s car ended up in a water channel on the other side of the road and the airbags deployed. *Id.* at 6-7, 39, 41, 43, 45. After the crash, T.C. and his passengers got out of the vehicle. *Id.* Two of the ATV riders (I.G. and H.T.) were lying on the side of the road, two (S.K. and O.M.A.) had been knocked down a cliff, and one (T.A.) was under T.C.'s car. *Id.* at 5, 7, 13, 16, 39, 41, 43, 45. O.M.A. died from internal bleeding as a result of the crash; T.A. suffered life-threatening injuries; I.G. was in shock, lost consciousness, and suffered serious injuries; H.T. was injured and lost consciousness; and S.K. was also injured. *Id.* at 4-5, 13, 16, 18. After the crash, witnesses reported hearing T.C. repeatedly say, "My life is over." *Id.* at 7, 41, 43.

According to witnesses, T.C. and his friends had been driving around for some time before the crash. *Id.* at 38-39, 44-45. None of the passengers in T.C.'s or D.O.O.'s vehicles reported to authorities that T.C. had been intoxicated, although T.C. fled the scene before any tests could be

performed. *Id.* at 7. A mechanical engineer examined the Porsche that T.C. was driving and found no mechanical issues that would have caused the car to malfunction. *Id.* at 37. Neither T.C. nor his friends had driver's licenses. *Id.* at 6-7, 45.

Immediately after the crash, T.C. called his personal driver and Tok. *Id.* at 39, 45. About ten minutes later, T.C.'s mother, Eylem Tok, arrived at the scene and took T.C. and two of his friends, D.O.O. and A.K., home. *Id.* T.C. then fled Türkiye. *Id.* at 7. Surveillance footage at the airport reflects that T.C. and Tok arrived at the airport by 2:11 a.m. on March 2, 2024, barely three hours after the crash. *Id.* at 49. T.C. and Tok traveled to Cairo and continued on to the United States, landing in New York later that day. *Id.* at 4, 7, 51-52.

## II.    Procedural History

On March 7, 2024, Turkish authorities issued an arrest warrant for T.C. for the offense of Causing Reckless Killing and Injury. Dkt. 70-3 at 59. On April 3, 2024, Türkiye transmitted its Extradition Request. Dkt. 70-1 at 4. After vetting by attorneys at the Departments of State and Justice, the Southern District of Florida swore out a complaint for the extradition of T.C. on the charge of Causing Reckless Killing and Injury, and a magistrate judge in that district issued a warrant for T.C.'s arrest. Dkt. 5-1; Dkt. 5-2. T.C. was arrested in Boston on June 14, 2024.

## III.   Legal Background

"Extradition is largely a concern of the Executive Branch" with a limited role carved out for the judiciary pursuant to the federal extradition statute, 18 U.S.C. § 3184. *Drumm v. McDonald*, No. 15-cv-14221, 2016 WL 111411, at *4 (D. Mass. Jan. 11, 2016). Pursuant to Section 3184, the extradition court must conduct an extradition hearing and make a probable cause determination under "the same . . . standard used in federal preliminary hearings." *Noeller v. Wojdylo*, 922 F.3d 797, 803 (7th Cir. 2019) (quoting *Hoxha v. Levi*, 465 F.3d 554, 561 (3d Cir. 2006)). However, the

country seeking extradition is not otherwise "required to try its case in a United States court." *Id.* at 804. That is because "an extradition hearing is not a criminal prosecution" and "the order of extraditability expresses no judgment on [T.C.'s] guilt or innocence." *Austin v. Healey*, 5 F.3d 598, 603 (2d Cir. 1993).

At the extradition hearing, the Court should consider the evidence presented on behalf of the requesting country and determine whether the legal requirements for certification—as defined in the Treaty, statutes, and case law—have been established. *See Quinn v. Robinson*, 783 F.2d 776, 786 n.3 (9th Cir. 1986) (citing *Charlton v. Kelly*, 229 U.S. 447, 461 (1913)); *In re Extradition of Garcia*, 825 F. Supp. 2d 810, 815 (S.D. Tex. 2011). If any evidence is offered by the fugitive, the Court should rule on its admissibility. Once the evidentiary record is complete, the Court should make written findings of fact and conclusions of law as to each of the elements for certification. *See Shapiro v. Ferrandina*, 478 F.2d 894, 906 (2d Cir. 1973). If the Court finds that the requirements for certification are satisfied, it must provide the certification to the Secretary of State, together with a copy of any testimony taken before the Court, and it must commit the fugitive to the custody of the United States Marshal to await the Secretary's final determination regarding surrender. 18 U.S.C. § 3184; *see Martin v. Warden, Atlanta Pen.*, 993 F.2d 824, 828-29 (11th Cir. 1993). The Secretary will then decide whether to surrender the fugitive to the requesting country. 18 U.S.C. §§ 3184, 3186; *Escobedo v. United States*, 623 F.2d 1098, 1105 (5th Cir. 1980) ("The ultimate decision to extradite is a matter within the exclusive prerogative of the Executive in the exercise of its powers to conduct its foreign affairs."). "This bifurcated procedure reflects the fact that extradition proceedings contain legal issues peculiarly suited for judicial resolution, such as questions of the standard of proof, competence of evidence, and treaty construction, yet simultaneously implicate questions of foreign policy, which are better answered by the executive

branch." *United States v. Kin-Hong*, 110 F.3d 103, 109 (1st Cir. 1997).

In fulfilling its function under Section 3184, the judicial officer should construe liberally the applicable extradition treaty in order to effect its purpose, namely, the surrender of fugitives to the requesting country. *See Factor v. Laubenheimer*, 290 U.S. 276, 303 (1933) ("Extradition treaties are to be liberally, not strictly, construed."); *In re Extradition of Nezirovic*, No. CIV.A. 7:12MC39, 2013 WL 5202420, at *5 (W.D. Va. Sept. 16, 2013) ("Treaties are construed liberally to favor the obligation to surrender fugitives.") (citation omitted). To that end, an extradition hearing is not a criminal proceeding. Its purpose is to decide the sufficiency of the charges under the treaty, not to determine the fugitive's guilt or innocence; that is for the foreign court. *See, e.g.*, *Collins v. Loisel*, 259 U.S. 309, 316 (2022); *Neely v. Henkel*, 180 U.S. 109, 123 (1901); *Benson v. McMahon*, 127 U.S. 457, 463 (1888). Because of the limited nature of the hearing, special procedural and evidentiary rules apply. For example, the rights available to a defendant in a criminal trial do not attach to a fugitive in international extradition proceedings. *See Neely*, 180 U.S. at 122 (rights available to one charged with criminal offense in this country not applicable to offenses committed outside the United States against the laws of another country); *accord Charlton*, 229 U.S. at 461; *Martin*, 993 F.2d at 829. The purpose of an extradition hearing is not to try the underlying charge; that is for the foreign court. *Neely*, 180 U.S. at 123. Accordingly, neither the Federal Rules of Criminal Procedure nor the Federal Rules of Evidence apply to extradition proceedings. *See* Fed. R. Crim. P. 1(a)(5)(A) ("Proceedings not governed by these rules include . . . the extradition and rendition of a fugitive."); Fed. R. Evid. 1101(d)(3) ("These rules – except for those on privilege – do not apply to . . . miscellaneous proceedings such as extradition or rendition."); *Balzan v. United States*, 702 F.3d 220, 224 (5th Cir. 2012). Moreover, the fugitive has no right to discovery. *See, e.g.*, *Prasoprat v. Benov*, 421 F.3d 1009, 1014 (9th Cir. 2005), *cert.*

*denied*, 546 U.S. 1171 (2006); *Messina v. United States*, 728 F.2d 77, 80 (2d Cir. 1984).

The fugitive's right to present evidence is severely constrained, and his Constitutional rights are limited. For example, the fugitive has no right to cross-examine witnesses who might testify at the hearing or confront his accusers, *see Bingham v. Bradley*, 241 U.S. 511, 517 (1916); *Ordinola v. Hackman*, 478 F.3d 588, 608 (4th Cir. 2007), *cert. denied*, 128 S. Ct. 373 (2007); nor is there a Sixth Amendment right to a speedy extradition, *see McDonald v. Burrows*, 731 F.2d 294, 297 (5th Cir. 1984); *Martin*, 993 F.2d at 829; *Sabatier v. Dabrowski*, 586 F.2d 866, 869 (1st Cir. 1978). The exclusionary rule is inapplicable, *see Simmons v. Braun*, 627 F.2d 635, 636–37 (2d Cir. 1980); and the Fifth Amendment guarantee against double jeopardy does not apply to successive extradition proceedings, *see Collins*, 262 U.S. at 429; *In re Extradition of McMullen*, 989 F.2d 603, 612–13 (2d Cir. 1993), *cert. denied*, 510 U.S. 913 (1993).

Extradition treaties do not require, or even anticipate, live witness testimony at the hearing because to do so "would defeat the whole object of the treaty." *Yordi v. Nolte*, 215 U.S. 227, 231 (1909); *see also Bingham*, 241 U.S. at 517. Thus, hearsay evidence is admissible at extradition hearings and may properly support a court's findings leading to a certification under Section 3184. *See Collins*, 259 U.S. at 317; *Bingham*, 241 U.S. at 517 (rejecting fugitive's claim that *ex parte* witness affidavits submitted in support of his extradition to Canada should not be considered because he had not had the opportunity to cross-examine those witnesses); *Hoxha*, 465 F.3d at 562; *Haxhiaj v. Hackman*, 528 F.3d 282, 292 (4th Cir. 2008) ("[C]ourts have consistently concluded that hearsay is an acceptable basis for a probable cause determination in the extradition context. Unsworn statements can be sufficient to support a probable cause determination.") (citations omitted); *O'Brien v. Rozman*, 554 F.2d 780, 783 (6th Cir. 1977) (citing cases). Nothing more is required, and typically, nothing more is provided. *See, e.g.*, *Bovio v. United States*, 989

F.2d 255, 259 (7th Cir. 1993); *Zanazanian*, 729 F.2d at 626-27 (unsworn written statements may properly form the basis for certification).

Accordingly, a finding of extraditability may be, and typically is, based entirely on the four corners of the authenticated documentary evidence and information the requesting government has provided. *See, e.g.*, *Afanasjev v. Hurlburt*, 418 F.3d 1159, 1162-63, 1166 (11th Cir. 2005) (upholding probable cause determination based on unsworn 106-page bill of indictment prepared by a foreign investigator describing witness statements and other hearsay evidence); *Manta v. Chertoff*, 518 F.3d 1134, 1139-40, 1145-47 (9th Cir. 2008) (upholding probable cause determination based on investigation report written by prosecutor); *Bovio*, 989 F.2d at 259-61 (Swedish investigator's statement sufficient to establish probable cause); *O'Brien*, 554 F.2d at 783; *Shapiro*, 478 F.2d at 902-03; *Castro Bobadilla v. Reno*, 826 F. Supp. 1428, 1433-34 (S.D. Fla. 1993) (documents and statements sufficient for extradition to Honduras), *aff'd*, 28 F.3d 115 (11th Cir. 1994). The finding may rest upon written statements from a foreign prosecutor, judge, or officer summarizing the evidence. *Rice v. Ames*, 180 U.S. 371, 375-76 (1901); *Jean v. Mattos*, No. 13-CV-5346, 2014 WL 885058, at *5 (D.N.J. Mar. 5, 2014) ("That some evidence is 'alluded to' rather than 'reproduced' – for example, the police reports from which witness statements were presumably extracted are not in the record – does not diminish the validity of what is satisfactorily described."); *accord Glucksman v. Henkel*, 221 U.S. 508, 513-14 (1911); *Garcia*, 825 F. Supp. 2d at 830 ("[E]xtradition can be predicated entirely on the 'unsworn statements of absent witnesses.'") (quoting *Collins*, 259 U.S. at 317).

Due to the nature and limited purpose of an extradition hearing under Section 3184 and the importance of the United States' fulfilling its obligations under an extradition treaty, a fugitive's opportunity to challenge the evidence introduced against him is heavily circumscribed. A fugitive

may not introduce evidence that contradicts the evidence the government submits on behalf of the requesting country, but may only introduce evidence explaining the submitted evidence. *See Charlton*, 229 U.S. at 457-58; *Hoxha*, 465 F.3d at 561 ("Courts have traditionally distinguished between inadmissible 'contradictory evidence,' which merely conflicts with the government's evidence, and admissible 'explanatory evidence,' which entirely eliminates probable cause."). *Ordinola*, 478 F.3d at 608.[2] "The accused is not entitled to introduce evidence which merely goes to his defense but may offer limited evidence to explain elements in the case against him, since the extradition proceeding is not a trial of the guilt or innocence but of the character of a preliminary examination held before a committing magistrate to determine whether the accused shall be held for trial in another tribunal." *Jimenez v. Aristeguieta*, 311 F.2d 547, 556 (5th Cir. 1962); *see also Hooker*, 573 F.2d at 1368 ("[T]he extraditing court properly may exclude evidence of alibi, of facts contradicting the government's proof, or of a defense such as insanity . . . . Because of the limited function of an extradition proceeding and the limited participation permitted of the fugitive, the order of the court does not reflect a consideration of all the merits of the case."). Accordingly, the First Circuit has emphasized that the purpose of permitting explanatory evidence is to afford the relator "the opportunity to present reasonably clear-cut proof which would be of limited scope and have some reasonable chance of negating a showing of probable cause," recognizing that "extradition proceedings are not to be converted into a dress rehearsal trial." *Koskotas*, 931 F.2d at 175 (1st Cir. 1991) (internal quotation marks and citations omitted).

That "explanatory evidence" is permitted but "contradictory evidence" is prohibited flows

---

[2] The extent to which a fugitive may offer explanatory proof is largely within the court's discretion. *See Koskotas v. Roche*, 931 F.2d 169, 175 (1st Cir. 1991); *Hooker v. Klein*, 573 F.2d 1360, 1369 (9th Cir.), *cert. denied*, 439 U.S. 932 (1978); *In re Extradition of Singh*, 124 F.R.D. 571, 572-73 (D.N.J. Nov. 2, 1987) (citing cases); *United States ex rel Petrushansky v. Marasco*, 325 F.2d 562, 567 (2d Cir. 1963), *cert. denied*, 376 U.S. 952 (1964) (citing cases).

from the rule than an extradition judge may not weigh conflicting evidence and determine what to credit, "but, rather, determines only whether there is competent evidence to support the belief that the accused has committed the charged offense." *Quinn*, 783 F.2d at 815. "Testimony that merely gives the opposite version of the facts does not destroy the probability of guilt" and thus is inadmissible. *United States v. Fernandez-Morris*, 99 F. Supp. 2d 1358, 1361 (S.D. Fla. 1999). Similarly, evidence (or argument) regarding the credibility of the requesting country's witnesses must be disregarded. *See, e.g.*, *Bovio*, 989 F.2d at 259 (rejecting evidence that major witness lied during the investigation because "issues of credibility are to be determined at trial"); *In re Extradition of Shaw*, No. 14-CV-81475, 2015 WL 344022, at *8 (S.D. Fla. May 28, 2015) ("[Fugitive] has consistently attempted to contradict the case brought against him in [the requesting country] . . . . This [he] cannot do."); *In re Extradition of Cervantes Valles*, 268 F. Supp. 2d 758, 772 (S.D. Tex. 2003) ("Explanatory evidence, then, is taken to mean evidence that provides an innocent explanation for the matters which the government contends point toward guilt.").

In concert with this limited scope of "explanatory" evidence, an extradition magistrate is bound to view submissions of the requesting country as true. *See, e.g.*, *In re Solis*, 402 F. Supp. 2d 1128, 1131 (C.D. Cal. 2005) ("Because [the fugitive's] argument does not accept Mexico's evidence as true, it is contradictory rather than explanatory within the meaning of extradition law."); *In re Extradition of Nunez-Garrido*, 829 F. Supp. 2d 1277, 1294 (S.D. Fla. 2011) (fugitive's claim that his shooting was accidental contradicted requesting country's autopsy report, and therefore, could not "be thought to merely 'explain' the Government's evidence"); *In re Extradition of Cheung*, 968 F. Supp. 791, 794 n.6 (D. Conn. 1997) (stating that the court "must accept as true all of the statements and offers of proof by the demanding state,' even if they contain hearsay.") (quotation omitted); *Desautels v. United States*, 782 F. Supp. 942, 944 n.2 (D. Vt. 1991);

*Ahmad v. Wigen*, 726 F. Supp. 389, 399-400 (E.D.N.Y. 1989); *In re Extradition of Atta*, 706 F. Supp. 1032, 1050-51 (E.D.N.Y. 1989) ("The primary source of evidence for the probable cause determination is the extradition request, and any evidence submitted in it is deemed truthful for the purposes of this determination.") (citing *Collins*, 259 U.S. at 315-16).

Other than the sufficiency of the evidence, all matters that a fugitive may raise as defenses to extradition are to be considered by the Secretary of State, not by the court. *See* 18 U.S.C. §§ 3184, 3186. In making extradition determinations, "[t]he Secretary exercises broad discretion and may properly consider factors affecting both the individual defendant as well as foreign relations—factors that may be beyond the scope of the magistrate judge's review." *Sidali v. INS*, 107 F.3d 191, 195 n.7 (3d Cir. 1997). The Secretary considers humanitarian claims and applicable statutes, treaties, or policies regarding appropriate treatment in the requesting country. *See Escobedo*, 623 F.2d at 1105. This is consistent with the long-held understanding that deciding whether to surrender a fugitive to a foreign government is "purely a national act . . . performed through the Secretary of State" within the executive's powers to conduct foreign affairs. *In re Kaine*, 55 U.S. 103, 110 (1852).

Similarly, a fugitive's contention that the extradition request is politically motivated or that the requesting state's justice system is unfair should be addressed by the Secretary of State, not the court. *See Koskotas*, 931 F.2d at 173-74 (noting that requesting state's motives are for executive branch to consider); *Kin-Hong*, 110 F.3d at 110 ("It is not that questions about what awaits the relator in the requesting country are irrelevant to extradition; it is that there is another branch of government, which has both final say and greater discretion in these proceedings, to whom these questions are more properly addressed"); *see also Prasoprat*, 421 F.3d at 1016; *Blaxland v. Commonwealth Director*, 323 F.3d 1198, 1208 (9th Cir. 2003); *In re Extradition of*

*Singh*, 123 F.R.D. 127, 130 (D.N.J. Nov. 2, 1987).

## **ARGUMENT**

The Court should deny T.C.'s motion to dismiss and certify T.C.'s extradition to Türkiye for the Secretary of State's surrender decision because the requirements for such certification have been met. *See* 18 U.S.C. § 3184; *see also, e.g.*, *Taylor*, 484 F. Supp. 3d at 15.

**I.   The Court Has Subject Matter Jurisdiction to Conduct These Extradition Proceedings**

This Court has subject matter jurisdiction to conduct these extradition proceedings under the extradition statute, 18 U.S.C. § 3184, and Rule 1(e) of the Rules for United States Magistrate Judges in the United States District Court for the District of Massachusetts ("MJ Rules"). *See* 18 U.S.C. § 3184 (extradition proceedings may be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States"); MJ Rule 1(e) ("Each United States Magistrate Judge appointed by this court is authorized to . . . [c]onduct extradition proceedings, in accordance with 18 U.S.C. Section 3184[.]").

**II.   The Court Has Personal Jurisdiction over T.C.**

This Court has personal jurisdiction over T.C. pursuant to 18 U.S.C. § 3184 because he was found and arrested in the District of Massachusetts. *See* 18 U.S.C. § 3184 (the magistrate judge "may, upon complaint made under oath, charging any person found within his jurisdiction, . . . issue his warrant for the apprehension of the person so charged"); *see also, e.g.*, *Pettit v. Walshe*, 194 U.S. 205, 219 (1904) ("The commissioner or judicial officer here referred to is necessarily one acting as such within the state in which the accused was arrested and found.").

**III.   The Applicable Extradition Treaty Is in Full Force and Effect**

Section 3184 provides for extradition in instances in which a treaty or convention is in force between the requesting state and the United States. Courts defer to the Executive Branch on

the question of whether a treaty is in force. *See, e.g.*, *Terlinden v. Ames*, 184 U.S. 270, 288-89 (1902). Here, the United States has submitted the Declaration of Tom Heinemann, an Attorney Adviser in the Office of the Legal Adviser for the Department of State, attesting to the fact that the Treaty is in full force and effect between the United States and Türkiye. *See* Dkt. 70-1 at 2-3 (Heinemann Declaration ¶ 2).

## IV.  The Extradition Treaty Encompasses the Offense for Which Extradition Is Requested

The Treaty is what is known as a "hybrid" treaty because it contains elements of both a list and the more modern dual criminality requirement. In particular, Articles 1 and 2 of the Treaty provide for the extradition of fugitives who have been charged with (1) "Offenses, regardless of whether listed in the Appendix to this Treaty or not, which are punishable under both the federal laws of the United States and the laws of Turkey by deprivation of liberty at least for a period exceeding one year or by a more severe penalty"; or (2) "Offenses listed in the Appendix to this Treaty which are punishable under both the laws of the Requesting Party and the Requested Party for at least a period exceeding one year or by a more severe penalty."

In determining whether an offense is punishable under the laws of both countries, extradition courts look to the underlying acts to determine whether, if they had been committed in the United States, they would violate United States federal law, the law of the state in which the hearing is held, or the law of the preponderance of the states. *See In re Extradition of Manzi*, 888 F.2d 204, 207 (1st Cir. 1989); *Cucuzzella v. Keliikoa*, 638 F.2d 105, 107 (9th Cir. 1981). Because extradition treaties should be "interpreted with a view to fulfil our just obligations to other powers[,]" *Grin v. Shine*, 187 U.S. 181, 184 (1902); *see Factor*, 290 U.S. at 303, a court should "approach challenges to extradition with a view toward finding the offense within the treaty," *McElvy v. Civiletti*, 523 F. Supp. 42, 48 (S.D. Fla. 1981); *see also Martinez v. United States*, 828

F.3d 451, 463 (6th Cir. 2016) (en banc) ("The point of an extradition treaty after all is to facilitate extradition . . . ."), *cert. denied*, 137 S. Ct. 243 (2016).

The Turkish offense need not be identical to ours. Indeed, the Supreme Court held that dual criminality exists "if the particular act charged is criminal in both jurisdictions," even if the name of the offense or the scope of the liability differs in the two countries. *Collins*, 259 U.S. at 312; *see United States v. Riviere*, 924 F.2d 1289, 1302 (3d Cir. 1991) ("[T]he rule of double criminality does not require that the elements, purposes, or punishment for foreign offenses be identical to ours."); *see also* Dkt. 70-1 at 9 (Treaty, Article 2(1)(b)). As the First Circuit has explained, "[t]he purpose of the dual criminality requirement is simply to ensure that extradition is granted only for crimes that are regarded as serious in both countries." *Kin-Hong*, 110 F.3d at 114 (citing *United States v. Saccoccia*, 58 F.3d 754, 766 (1st Cir. 1995)).

The charge for which Türkiye seeks T.C.'s extradition—Causing Reckless Killing and Injury—is both listed in the Appendix to the Treaty and is an offense punishable under both the laws of the United States and Türkiye for a period exceeding one year. The Appendix lists, at item #2, "Manslaughter"; at item #3 "Aggravated wounding, injury, or assault, even when loss of life results"; and at item #25, "Any act willfully jeopardizing the safety of any person traveling upon a railway or in any aircraft or vessel or other means of transportation" as extraditable offenses. Manslaughter is defined as the unlawful killing of a human being without malice, *e.g.*, 18 U.S.C. § 1112, which covers T.C.'s conduct here in recklessly, but not maliciously, causing a crash that resulted in the death of one person and injury to four others. His conduct also constitutes aggravated wounding because his willful and reckless acts caused severe personal injury to others. Lastly, his conduct also jeopardized the safety of his victims, who were out riding ATVs that night, by continuing to drive recklessly even after his passengers asked him to slow down and put on

14

their seatbelts "just in case."

T.C.'s conduct underlying this charge—driving a sportscar more than 140 kilometers per hour (approximately 87 miles per hour) above the speed limit late at night on a dark and winding road and without a driver's license—resulted in the death of one person and injury to four others. There is no allegation that T.C. intended to harm the victims, but his behavior was nonetheless reckless and resulted in an unlawful killing of one person and the serious bodily injury of others. If he had engaged in such conduct here, T.C. could be charged with Involuntary Manslaughter, in violation of 18 U.S.C. § 1112 or M.G.L. c. 265, § 13, Homicide by Motor Vehicle, in violation of M.G.L. c. 90, § 24G(c), Aggravated Assault and Battery, in violation M.G.L. c. 265, § 13A(b)(i), or Aggravated Assault and Battery with a Dangerous Weapon, in violation of M.G.L. c. 265, § 15A(c)(i).[3]

In the United States, the charge of Involuntary Manslaughter carries a punishment of up to 8 years of imprisonment under 18 U.S.C. § 1112(b), or 20 years of imprisonment under M.G.L. c. 265, § 13. The charges of Homicide by Motor Vehicle and Aggravated Assault and Battery each carry sentences of up to five years of imprisonment, M.G.L. c. 90, § 24G(c); M.G.L. c. 265 §13A(b), and Aggravated Assault and Battery with a Dangerous Weapon carries a sentence of up to 15 years of imprisonment. M.G.L. c. 265 § 15A(c).

If T.C. were charged as a juvenile delinquent in the federal system, he could be punished with official detention until he was 21 years old, or approximately four years. 18 U.S.C.

---

[3] *See* Appendix; *see also, e.g.*, *Commonwealth v. Eberhart*, 461 Mass. 809, 818 (2012) (defining "reckless battery" as "wilful, wanton and reckless act which results in personal injury to another") (citation omitted); *Commonwealth v. Escobar*, 490 Mass. 488, 499-500 (2022) ("[A]ggravated assault and battery, where the offense involves a dangerous weapon, may be prosecuted under either a theory of intent or a theory of recklessness.") (citation omitted).

§ 5037(c)(1)(A). Alternately, he could be proceeded against as an adult under the conditions set forth in 18 U.S.C. § 5032, in which case he would face the same sentence as an adult. Similarly, under Massachusetts law, a court could sentence T.C. as a youthful offender to the sentence provided by law for adults or commit him to the Department of Youth Services until he reaches 21. M.G.L. c. 119, § 58.[4]

According to the Extradition Request, the offense of Causing Reckless Killing and Injury is punishable under Turkish law by two to 15 years of imprisonment when the offense results in "the injury of one or more persons together with death of one or more persons." Dkt. 70-3 at 3 (quoting Article 85(2) of the Turkish Criminal Code). When, as here, the culprit is older than 15 but younger than 18, "the penalty to be imposed shall be reduced by one-third." *Id.* at 4 (quoting Article 31(3) of the Turkish Criminal Code). In other words, T.C. is subject to up to 10 years of imprisonment under Turkish law.

T.C. argues in his motion to dismiss that the Court should nevertheless dismiss the complaint for extradition because T.C. has not been indicted or otherwise formally charged in Türkiye, in violation of Articles 1 and 7 of the Treaty. Dkt. 87. This argument misconstrues the requirements of Articles 1 and 7. Article 1 provides for the extradition of persons "*who are being prosecuted for or* have been charged with an offense, or convicted of an offense, or are sought by

---

[4] Specifically, M.G.L. c. 119, § 52 defines a "youthful offender" as "a person who is subject to an adult or juvenile sentence for having committed, while between the ages of fourteen and 18, an offense against a law of the commonwealth which, if he were an adult, would be punishable by imprisonment in the state prison, and . . . (b) has committed an offense which involves the infliction or threat of serious bodily harm in violation of law." Under M.G.L. c. 119, § 58, the court can sentence a youthful offender to "(a) a sentence provided by law; or (b) a combination sentence which shall be a commitment to the department of youth services until he reaches the age of twenty-one, and an adult sentence to a house of correction or to the state prison as is provided by law for the offense . . . . ; or (c) commitment to the department of youth services until he reaches the age of twenty-one."

the other Party for the enforcement of a judicially pronounced penalty for an offense . . . ." Dkt. 70-1 at 8 (emphasis added). There is no reference to formal charges or indictment. Article 7 confirms as much in that it does not require the requesting party to include a charging document in the extradition request. *Id.* at 13-14 (extradition request must contain the warrant for arrest, a statement of the facts, evidence sufficient to justify arrest and committal for trial, evidence sufficient to establish that the person sought is the person named in the warrant, and the text of the laws governing the offense, punishment, and statute of limitations).

Courts have consistently held that, when a treaty does not require the submission of a charging document in support of an extradition request, formal charges are not required, notwithstanding any use of the term "charged" in Article 1 of the respective treaties.[5] *See, e.g.*, *Manrique v. Kolc*, 65 F.4th 1037, 1041-43 (9th Cir. 2023); *Sacirbey v. Guccione*, 589 F.3d 52, 63-67 (2d Cir. 2009); *Emami v. U.S. Dist. Ct. for the N. Dist. of Cal.*, 834 F.2d 1444, 1448 (9th Cir. 1987); *Matter of Assarsson*, 635 F.2d 1237, 1242-44 (7th Cir. 1980); *cf. Vitkus v. Blinken*, 79 F.4th 352, 365-66 (4th Cir. 2023) (agreeing with the aforementioned cases but holding that formal charges were required in Vitkus's case because the treaty at issue (Lithuania) required that the requesting state provide "a copy of the charging document" with its extradition request).

Contrary to T.C.'s contention, *see* Dkt. 87 at 3, the First Circuit's decision in *Aguasvivas v. Pompeo*, 984 F.3d 1047 (1st Cir. 2021), confirms that formal charges are not required here. In *Aguasvivas*, the extradition treaty at issue (with the Dominican Republic) required that, in a pre-conviction case, the requesting state provide in its extradition request, among other things, "(a) a

---

[5] Even if the Court were to find that the term "have been charged with an offense" in Article 1 of the Treaty contemplates formal charges, Article 1 also provides for the extradition of a person who is simply "being prosecuted" for an offense.

copy of the warrant or order of arrest or detention issued by a judge or other competent authority; [and] (b) a copy of the document setting forth the charges against the person sought." The First Circuit held that the same document, a warrant in that particular case, could not be used to satisfy both requirements; rather, some additional document setting forth the charges was required. *Id.* at 1057-61. In reaching this conclusion, the First Circuit expressly stated that it agreed with the Seventh Circuit in *Assarsson* and the Ninth Circuit in *Emami*, cited above, that extradition is not conditioned on the filing of formal charges when the treaty's list of required documents contains no reference to any formal document evidencing the charges being brought. *Aguasvivas*, 984 F.3d at 1060 ("We readily agree with the holdings and the rationale in both *Emami* and *Assarsson*. So we could rule for the government in this case were the language of this treaty materially similar to the language of those treaties.").

T.C.'s reliance on the Turkish version of the Treaty, Dkt. 87 at 1, does not alter the analysis. The United States Senate ratified the English version of the Treaty, and therefore, the English version is part of the official Treaty document. To the extent T.C. suggests that the Turkish version requires something different than the English version, he provides nothing beyond his unnamed Turkish counsel's purported representations, Dkt. 87 at 1, which in any event are wholly inconsistent with the views of the two treaty partners: Türkiye submitted its request for T.C. under the Treaty, and the U.S. Department of State signed a declaration confirming compliance with the Treaty. *See* Dkt. 70-1 at 2-3. Deference is owed to the Treaty partners on this issue, *see, e.g.*, *Kolovrat v. Oregon*, 366 U.S. 187, 194 (1961) (giving deference to the interpretation of a treaty provision as set forth in diplomatic notes exchanged between the responsible agencies of the United States and Yugoslavia); *Arias Leiva v. Warden*, 928 F.3d 1281 (11th Cir. 2019) (finding that the U.S.-Colombia extradition treaty was in full force and effect because, *inter alia*, both the

United States and Colombia understand it to be in effect), and the Treaty is "to be construed liberally in favor of enforcement because they are 'in the interest of justice and friendly international relations.'" *Kin-Hong*, 110 F.3d at 110 (quoting *Factor*, 290 U.S. at 293); *see also In re Gambino*, 421 F. Supp. 2d 283, 309-10 (D. Mass. 2006) (finding that even if English and Italian versions of extradition treaty conflicted, the more liberal interpretation prevails).

T.C. also argues that the Extradition Request omits that he is a U.S. citizen, such that the government could exercise its discretion under Article 4 not to extradite T.C. Dkt. 87 at 2. But at the outset of its Extradition Request, Türkiye states that T.C. was born in "EXETER / USA." Dkt. 70-3 at 3; *see also id.* at 60. The arrest warrant also notes T.C.'s place of birth as "EXETER /USA." *Id.* at 59. The Fourteenth Amendment of the U.S. Constitution provides that anyone born in the United States is automatically a U.S. citizen. If there was any doubt, the Extradition Request includes an airline passenger list identifying T.C.'s nationality as "United States of America." *Id.* at 51. T.C. does not suggest and cannot show that the government missed this information in reviewing the Extradition Request. Moreover, the Secretary of State, and not this Court, is the appropriate authority to consider what effect, if any, to give T.C.'s U.S. citizenship.

To the extent T.C. contends that Türkiye was required to state T.C.'s citizenship more explicitly, that argument "savors of technicality," and is not a proper basis for dismissing these proceedings. *See*, *e.g.*, *Bingham v. Bradley*, 241 U.S. 511, 517 (1916). In any event, dismissal on this ground would be futile because the United States could reinitiate extradition proceedings with a more explicit description of T.C.'s nationality because the principle of double jeopardy does not apply to successive extradition proceedings. *E.g., Collins*, 262 U.S. at 429.

## V.     There Is Probable Cause to Believe T.C. Committed the Alleged Offense

The standard of proof to find the evidence "sufficient to sustain the charge" under 18 U.S.C.

§ 3184 is the familiar domestic requirement of probable cause. *See, e.g.*, *Collins*, 259 U.S. at 316 ("The function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction."); *Benson*, 127 U.S. at 463 (extradition hearings are akin to "preliminary examinations which take place every day in this country before an examining or committing magistrate for the purpose of determining whether a case is made out which will justify the holding of the accused"). Probable cause is established if there are "facts and circumstances sufficient to warrant a prudent man in believing that the (suspect) had committed or was committing an offense." *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) (internal quotations and citation omitted).

To certify T.C.'s extraditability to Türkiye, the Court must conclude that there is probable cause to believe that the crime charged was committed and that the person before the Court committed it. *See Hoxha*, 465 F.3d at 561. Here, the evidence Türkiye submitted in support of its extradition request, including sworn statements from multiple witnesses, expert reports, and images of the crash scene, amply supports a finding of probable cause to believe that T.C. committed the offense of Causing Reckless Killing and Injury, in violation of Article 85 of the Turkish Criminal Code.

Article 85 provides in relevant part that "Any person who causes the death of another by reckless conduct shall be sentenced to a penalty of imprisonment . . . . If the act results in . . . the injury of one or more persons together with the death of one or more persons, the offender shall be sentenced to a penalty of imprisonment for a term of two to fifteen years." Dkt. 70-3 at 3. Türkiye's extradition request makes clear that T.C. was driving his mother's Porsche on the night in question more than 140 kilometers per hour (approximately 87 miles per hour) above the speed limit when he hit the victims. T.C. drove this fast despite that it was late at night and he was on a

dark and winding road. Notably, T.C. chose to drive that night despite that he did not have a driver's license. The evidence further shows that T.C. continued to speed even after his passengers asked him to slow down and put on their seatbelts "just in case." T.C.'s recklessness is further evidenced by the presence of a speed bump just before the crash scene and his decision to pass D.O.O., the driver of the other car. The mechanical engineer who investigated the scene confirmed that there was no malfunction with T.C.'s vehicle. The victims' statements reflect that they took proper precautions in pulling the broken-down ATV to a suitable area, turning on their hazard lights, and even turning the headlights of one of the ATVs in the direction of oncoming traffic to make sure that oncoming vehicles saw them. That they reported other vehicles passed them without incident further demonstrates the recklessness of T.C.'s driving. The photos of the crash scene, the damage to T.C.'s car (including airbags deploying) and ATVs, and that T.C. lost control of the car and ended up in a ditch are all additional evidence of T.C.'s recklessness. The displacement of the victims, two of whom were struck so hard they ended up over a cliff, one under T.C.'s car, and two in the road, as well as the harm they suffered—life-threatening injuries, unconsciousness, shock, and for one, death—further demonstrates the recklessness of T.C.'s conduct and the harm that resulted. T.C.'s own comments after the crash, that his life was "over," is an acknowledgment of his understanding that he was in the wrong that night. Accordingly, there is sufficient evidence to support a finding of probable cause that T.C. committed the offense of Causing Reckless Killing and Injury, in violation of Article 85 of the Turkish Criminal Code.

## **CONCLUSION**

For the foregoing reasons, the United States requests that the Court certify to the Secretary of State that T.C. is extraditable to Türkiye on the offense of Causing Reckless Killing and Injury.

Respectfully submitted,

JOSHUA S. LEVY
Acting United States Attorney

By:     /s/ Kristen A. Kearney
        KRISTEN A. KEARNEY

Date:  August 23, 2024                 Assistant U.S. Attorney

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Kristen A. Kearney
KRISTEN A. KEARNEY
Assistant U.S. Attorney