IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN THE MATTER OF ) | |
| THE EXTRADITION OF ) | No. 24-mj-01365-DLC |
| T.C. ) | |

**RESPONSE TO COURT ORDER (DKT. 126)**

The United States of America hereby responds to the Court's August 30, 2024 sealed Order, Dkt. 126.

On Friday, August 30, 2024, the Court issued a sealed Order that, *inter alia*, instructed the parties to submit a further brief limited to the issue of T.C.'s daytime restrictions. Dkt. 126. As explained in the accompanying Affidavit of Warden Todd Barcliff, Warden of the Essex County Juvenile Detention Center ("Essex JDC") in Newark, New Jersey, T.C. is confined to his cell from 9:00 p.m. to 8:00 a.m. each day. Barcliff Aff. ¶ 3. Now that school has resumed after a two-and-a-half-week recess, T.C. is in school weekdays from 8:00 a.m. until 2:00 p.m. *Id.* While in school, T.C. also has access to a gymnasium. *Id.* T.C. must return to his cell from 2:00 p.m. to 3:15 p.m. for a shift change. *Id.* After that, T.C. is permitted to leave his cell until 9:00 p.m., except when a new resident arrives in his housing unit. *Id.* ¶ 4. Notably, Essex JDC planned to move T.C. to a different unit that would not require him to be in his cell for new resident admissions, but T.C. requested to stay in his current unit because he felt safer there. *Id.* ¶ 2. At times, facility emergencies arise that require the unit to go into additional lockdowns for resident safety. *Id.* ¶ 5. Essex JDC staff strive to keep these disruptions to a minimum, but at times they are unavoidable. *Id.*

While the Barcliff Affidavit reflects that T.C. spends a considerable amount of daytime outside his cell, even if T.C. were confined to his cell for extended periods, courts considering

similar situations have found such conditions of confinement are not a special circumstance warranting release in an extradition matter.  For example, in *In re Extradition of Garcia*, 615 F. Supp. 2d 162 (S.D.N.Y. 2009), the court considered the detention of a U.S. citizen with significant ties to the United States for whom the court found the risk of flight to be "slight." *Id.* at 172-73.  The fugitive Garcia requested to be placed in segregation when initially detained, presumably believing he was safer there than in the general population.  *Id.* at 173.  However, he subsequently argued that his placement in a 24-hour locked-down segregated housing unit ("SHU") at the Metropolitan Detention Center ("MDC") in Brooklyn, with no access to a telephone or family visits, was a special circumstance warranting his release.  *Id.*  While noting that Garcia's conditions of confinement had improved in that he was moved to the general population of the MDC, the court found that "even if it could be shown" that "the problems that he encountered while in the SHU are continuing in general population," "unpleasant prison conditions do not entitle Garcia to be granted bail." *Id.* at 173-74; *see also In re Klein*, 46 F.2d 85 (S.D.N.Y. 1930) ("[D]iscomfort of the jail in which incarceration must be endured . . . . is an unavoidable incident.  One who voluntarily leaves his home shores for ours is subject alike to the disadvantages and the advantages that ensue from any applicable provision of a treaty between the two states concerned."); *Matter of Extradition of Manrique*, 442 F. Supp. 3d 1172, 1175 (N.D. Cal. 2020) ("*Manrique II*") ("Many people facing extradition have attained a degree of notoriety for their alleged crimes, and isolation in the context of protective custody is often justified by the government's 'compelling interest in prison safety.'").  Notably, T.C. elected to stay in a unit that experiences additional lockdowns upon the arrival of new residents, Barcliff Aff. ¶¶ 2 & 4, and T.C.'s counsel previously relayed to the government that T.C. did *not* want the government to intervene with officials at Essex JDC about his in-cell time because T.C. felt

safer there, Dkt. 115 at 3.  T.C.'s potential extended in-cell time cannot be a special circumstance where it is at least partially caused by his own choices.

In *Matter of Extradition of Manrique*, No. 19-mj-71055, 2019 WL 5168587 (N.D. Cal. Oct. 10, 2019) ("*Manrique I*"), the court took a different approach.  The fugitive Toledo, the former President of Peru, requested protective custody, and as a result had been held in solitary confinement for three months in the "increasingly notorious Santa Rita Jail," where he was confined to a small cell for all but an hour every two days.  *Id.* at *1; *Manrique II*, 442 F. Supp. 3d at 1175.  These conditions had a detrimental effect on his mental health.  *Manrique I*, 2019 WL 5168587 at *1.  The court expressed concern that these conditions were "likely to continue unabated for months, if not years, in light of the anticipated length" of the extradition proceedings in that case, where "Peru's extradition request contains thousands of documents that will require translation from several languages" and "issues of first impression" regarding the extradition treaty with Peru existed.  *Id.*  After finding that there were conditions that could significantly diminish Toledo's risk of flight, the court acknowledged it was a "close question," *Manrique II*, 442 F. Supp. 3d at 1176, and ordered Toledo released, but briefly stayed the order pending either an appeal to the Court of Appeals or notice from the government that an alternative detention arrangement could be made.  *Manrique I*, 2019 WL 5168587 at *2.  Ultimately, the government was able to move Toledo to another facility where he had minimal contact with other inmates, but was not completely segregated, and had access to a dayroom and nearly unlimited access to a telephone.  *Manrique II*, 442 F. Supp. 3d at 1177.  That, coupled with the discovery that Toledo's wife had concealed $1.5 million in assets, warranted his continued detention.  *Id.* at 1178.

3

Similar to the court in *Manrique I*, the government requests that, if this Court is inclined to release T.C. based on the conditions of his confinement at Essex JDC, that it stay its order to give the government the opportunity to move T.C. to another facility, potentially to include the Massachusetts Department of Youth Services where T.C. has requested to be moved.

                                                          Respectfully submitted,

                                                          JOSHUA S. LEVY
                                                          Acting United States Attorney

                                          By:    */s/ Kristen A. Kearney*
                                                         KRISTEN A. KEARNEY
Date:  September 5, 2024                    Assistant U.S. Attorney

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

                                                          */s/ Kristen A. Kearney*
                                                          KRISTEN A. KEARNEY
                                                          Assistant U.S. Attorney