UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

IN THE MATTER OF
EXTRADITION OF T.C.

No. 24-MJ-01365-DLC

ORDER ON RELATOR'S SECOND EMERGENCY MOTION
TO RECONSIDER ORDER DENYING RELEASE FROM DETENTION

CABELL, Chief U.S.M.J.

This matter arises out of an extradition request from the Republic of Türkiye ("Türkiye") pursuant to a treaty in force between the United States and Türkiye.[1] Pending before the court is a motion to reconsider the court's denial of a prior motion to release relator T.C. ("T.C.") from the Northeast Juvenile Detention Center in Newark, New Jersey, ("Newark") to reside with his aunt and uncle in Amesbury, Massachusetts, during the pendency of these extradition proceedings.[2] In the event he is not released to his relatives, T.C. seeks a transfer to the Massachusetts

_____

[1] Treaty on Extradition and Mutual Assistance in Criminal Matters Between the United States of America and the Republic of Turkey, U.S.-Turk., June 7, 1979, 32 U.S.T. 3111 (the "Treaty").

[2] The motion also challenges a refusal by the Manson Youth Institution ("Manson") in Cheshire, Connecticut, to accept T.C. back in its "custody because of the liability associated with Manson's own wrongdoing in this case." (D. 74, p. 1).

Department of Youth Services ("Mass DYS"). (D. 74). The government objects to T.C.'s release while taking no position on the transfer to Mass DYS. (D. 81). Chiefly because T.C. fails to show special circumstances that justify his release from Newark, the motion (D. 74) is denied.

## I.  THE PARTIES' ARGUMENTS

Anent special circumstances, T.C. argues that Newark is not a suitable facility to house a juvenile. (D. 74, 86). In that regard, he maintains that the facility is unsafe and imperils his physical and mental health. He seeks a reconsideration and his release primarily based on the following:  (1) a July 18 assault by three detainees in T.C.'s housing unit, which required stiches to his upper lip at a local hospital;[3] (2) the long distance of Newark from T.C.'s relatives in Amesbury and his counsel in Boston; (3) an inability to make direct calls to his father in Türkiye without first calling his attorney, who then must add his father to the phone call and stay on the line throughout the call; (4) the housing of 18 to 21-year-old individuals in the same unit as T.C. thus exposing him "to convicted offenders two, three, and nearly four years older" than him; (5) T.C.'s ▮▮▮▮▮▮▮▮▮▮▮▮▮, and fear for his safety, which cannot be accommodated at Newark;

---

[3] The assault additionally resulted in abrasions and loose teeth.

2

and (6) T.C.'s involuntarily confinement to his cell for 18 to 19 hours per day and, in the event of lockdown, 23.5 hours a day.[4] (D. 74, 86, 121, 135-1, 138).  Somewhat separately, he maintains that his current conditions violate his rights under the Fifth, Sixth, and Eighth Amendments.  (D. 74, ¶ 15).

As to conditions of release, T.C. is willing to abide by any conditions the court would impose if he is released to the care of his aunt and uncle.  T.C. also offers to pay for any oversight the court deems necessary.  (D. 74, 86).  To that end, he has secured GPS monitoring services provided by SCRAM, which provides such services to probation departments throughout the country.  (D. 86).

Lastly, T.C. maintains that the court should transfer him to Mass DYS as "the proper jail," 18 U.S.C. § 3184 ("section 3184"). (D. 74, ¶¶ 17-19).  He also objects to the unwillingness of the

---

[4] Related to the involuntary confinement, T.C. asserts he has limited access to the library and was allowed to borrow only three books in the seven weeks before September 6.  (D. 122) (August 27 video interview of T.C. stating three books in the last six weeks); (D. 138) (confirming he has not received  access to any additional books as of September 6).  After moving to the orientation unit on July 20, he was not allowed even one book to read as of August 5.  (D. 94). Further, he was taken to school only twice between July 20 and August 16, at which point the school went on recess until September 5.  (D. 137) (D. 132-1, ¶ 3) (D. 122).  Although not expressly discussed in section IV(A)(6), the court considered these circumstances in determining whether the involuntary confinement was a special circumstance.

3

United States Marshals Service ("the Marshals") to house him at Mass DYS on the basis that it is prohibitively expensive.

The government counters that Newark staff quickly stopped the assault, examined T.C., transported him to the hospital, and removed the three detainees suspected of assaulting T.C. to a separate housing unit. (D. 81, p. 2). Further, as the government points out, once T.C. returned from the hospital, staff placed him under medical supervision to be transferred to a different housing unit after he is medically cleared. (D. 81, p. 3). As such, the conduct is unlikely to reoccur, according to the government.

The government also disagrees with T.C.'s asserted involuntary confinement for extended time periods. It submits that T.C. is confined to his cell only from 9:00 p.m. to 8:00 a.m. and 2:00 p.m. to 3:15 p.m. for a shift change. (D. 132). Per the government, T.C. can attend school where he has access to a gymnasium. (D. 115-1, 132). He is also allowed Zoom calls with his father, the government contends, although it remains unclear if T.C.'s counsel must stay on the Zoom call throughout the conversation. (D. 115-1) (D. 74, p. 2, n.1).

## II.  LEGAL STANDARD

"[A] presumption against bail" applies "in extradition cases and only 'special circumstances' justify release on bail." *United States v. Kin-Hong*, 83 F.3d 523, 524 (1st Cir. 1996)

4

(citing *Wright v. Henkel,* 190 U.S. 40, 63 (1903)) (additional citations omitted); *accord Matter of Extradition of Taylor*, 471 F. Supp. 3d 389, 393 (D. Mass. 2020).  The burden falls squarely on the relator to show both that:  (1) "he is neither a flight risk, nor a danger to the community; and" (2) "there are 'special circumstances' [that] justify release on bail."  *Matter of Extradition of Drumm*, 150 F. Supp. 3d 92, 96 (D. Mass. 2015) (collecting cases); *accord United States v. Castaneda-Castillo*, 739 F. Supp. 2d 49, 55 (D. Mass. 2010) (noting twofold showing of neither risk of flight nor danger to community and special circumstances).

Special circumstances "are limited to situations in which '"the justification [for release] is pressing as well as plain."'" *Kin-Hong*, 83 F.3d at 524  (quoting *United States v. Williams*, 611 F.2d 914, 915 (1st Cir. 1979)).  "[W]hat constitutes a 'special circumstance'" falls within the "Court's sound discretion." *Drumm*, 150 F. Supp. 3d at 96 (citation omitted); *see Beaulieu v. Hartigan*, 554 F.2d 1, 1 (1st Cir. 1977) (stating "bail may be granted in the sound discretion of the district court" but "should be approached with caution" and granted "only upon a showing of special circumstances").  Examples of special circumstances are "case specific." *Castaneda-Castillo,* 739 F. Supp. 2d at 56.  For instance, they may include "a *serious* deterioration in the

5

relator's health" that cannot be accommodated or managed at the facility. *Kin-Hong*, 83 F.3d at 524 (emphasis added); *see In re Extradition of Huerta*, No. H-08-342M, 2008 WL 2557514, at *2 (S.D. Tex. June 23, 2008) (finding no special circumstance because Huerta's medical conditions, while serios, "are not life-threatening, nor are they so novel or complex as to be beyond the capacity of federal authorities to manage while he is in their custody."); *accord Matter of Extradition of Noeller*, No. 17 CR 664, 2017 WL 6462358, at *4 (N.D. Ill. Dec. 19, 2017) (finding no special circumstances because extraditee's medical condition was not "life threatening or so serious and exigent that his medical needs [could not] be accommodated . . . while in custody.").

The absence of a "suitable facility in which to detain a juvenile extraditee" may also amount to special circumstances. *Castaneda-Castillo*, 739 F. Supp. 2d at 56 (citing *Hu Yau-Leung v. Soscia*, 649 F.2d 914 (2d Cir. 1981)).

## III. __BACKGROUND__[5]

### A. __Events Prior to T.C.'s Confinement at Newark__

On July 9, 2024, the court denied T.C.'s motion for release from the Manson Youth Institution ("Manson") in Cheshire,

---

[5] The background is culled from the exhibits or, where largely undisputed, representations by the parties is their briefs.

Connecticut to reside with his aunt in Amesbury. (D. 59). The decision recounts the circumstances in Türkiye that led to the investigation of T.C. and an arrest warrant for the offense of causing a reckless killing and injury in violation of Article 85/2 of the Criminal Code of Türkiye. (D. 12, pp. 100, 151).

To briefly summarize these events, they took place shortly before midnight on March 1, 2024. At the time, T.C. was driving a Porsche on a two-lane, two-way road with an estimated speed limit of 18 miles per hour while traveling approximately 105-111 miles per hour. As he rounded a corner, he hit three ATVs parked on the side of the road and five individuals, one of whom died. (D. 12, pp. 121-122, 129, 131, 135, 137). Four hours later, he fled the country with his mother, Eylem Tok ("Tok"), on a flight to Cairo, from where they flew to the United States. (D. 12, pp. 96, 141, 143-144).

On June 14, T.C. was arrested, brought before this court for an initial appearance, and thereafter remanded to the custody of the Marshals. T.C. began his confinement at Manson the same day. Four days later, he filed the motion to be released from Manson. As indicated, the court denied the motion in the July 9 decision given the absence of special circumstances. Pertinent to the current motion for reconsideration and release, the decision did *not* foreclose reexamining the issue of special circumstances.

7

Specifically, the court explained it "would be prepared to revisit" the existence of special circumstances "should conditions going forward raise true, substantive concerns akin to some of those raised here or new (equally substantive) concerns based on changed conditions at whatever facility T.C. is being held." (D. 59, pp. 27-28).

On July 12, the Marshals transferred T.C. to Newark.[6] (D. 74, p. 1). Shortly thereafter, T.C. filed the first motion to transfer from Newark to Mass DYS or, alternatively, to reconsider the July 9 decision denying his release. (D. 65). The court denied the motion primarily because T.C. did not show the existence of special circumstances at Newark. (D. 71). The court also repeated the above-quoted language that it "would be prepared to revisit" the existence of special circumstances "based on changed conditions at whatever facility T.C. is being held," as pointed out by T.C. (D. 71) (D. 74, ¶ 9).

---

[6] T.C. argues that Manson refused to take him back in retaliation for the allegations he made in court filings and "the 'problems' associated with [Manson's] publication of T.C.'s personal information." (D. 86, ¶ 4) (D. 74, ¶ 5). In that vein, T.C. relatedly asserts that Manson's refusal to accept T.C. because of its own wrongdoing "constitute[s] a change in circumstance[] that demonstrate[s] the government's unwillingness to utilize a suitable facility" to house T.C. (D. 74, p. 1). He further submits that the refusal, even though "this [c]ourt had given [him] the option of returning to Manson," supports his current motion for release from Newark. (D. 74, ¶¶ 3, 5). The court disagrees. In any event, even if Manson did retaliate against T.C. in the manner alleged, the court fails to see the material relevance of Manson's conduct as warranting his release from a different facility, Newark.

## B. **Conditions at Newark**

T.C. began residing at Newark on July 12. Like Manson, Newark has a contract with the Marshals to house youth offender detainees for a certain fee. (D. 65, ¶ 7). In 2018, it was $400 to house a detainee per day at Mass DYS, which is not a contracted facility. As such, Mass DYS was more than three times the daily fee at Newark of approximately $120. (D. 81, p. 3) (D. 65, ¶ 7).

Newark houses pretrial detainees and sentenced youth offenders between the ages of 10 and 21. *See* https://essexcountyjail.org/essex-county-juvenile-detention-center.[7] (D. 81). Individuals arrested as juveniles at the age of 17 or younger remain at Newark until their sentencing, even if that occurs when the individual is 21 years old.[8] (D. 81). In that regard, T.C. states he is being held at Newark in a unit with individuals four years older than him. (D. 86, ¶ 5) (D. 65, ¶ 9).

Upon his arrival at Newark, T.C. described being separated from the general population "due to Covid." (D. 65, ¶ 9). ███████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[7] The court takes judicial notice of the above information. *See Doss v. Corizon, Inc.*, 636 F. Supp .3d 807, 811 n.1 (W.D. Mich. 2022) (taking judicial notice of information on Michigan Department of Corrections' website).

[8] Eighteen is the age of adulthood in New Jersey. *See* N.J. Stat. 2A:4A-22.

9

████████████.  (D. 65, ¶ 9) (D. 74, ¶ 1).  ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████.[9]

On July 14, T.C.'s counsel made the trip to Newark notwithstanding the distance from Boston and met with T.C.[10]  (D. 65, ¶ 9).  During the visit, T.C. lamented about not having a tablet, which Newark does not provide.  (D. 65, ¶¶ 9-10).  In addition to in-person meetings, Newark uses Zoom to facilitate attorney-client meetings both during the week and on Saturdays. (D. 81, p. 2) (D. 86, ¶ 6, sent. 2).

████████████████████████████████████████████████

████████████████████.  According to an internal staff report of the incident that a Newark supervising social worker read to T.C.'s counsel, T.C., who was housed in unit 8, asked other detainees if he could use the telephone.  Thereafter, three juveniles on the same unit assaulted T.C. from behind as he walked away from the telephone.  (D. 74, ¶ 6) (D. 86, ¶ 7).  T.C. was not argumentative

---

[9] ████████████████████████████████████████████████ (D. 74, ¶ 8).

[10] T.C.'s counsel described the drive as five hours from Boston.  As a result, an attorney-client visit is "virtually impossible without an overnight stay" or "on any semi-regular basis due to counsel's work schedule," according to T.C.'s counsel.  (D. 65, ¶ 12).

with the assailants and did not provoke the assault.[11]  (D. 86, ¶ 7).  He suffered a cut to his lip, abrasions, and loose teeth. (D. 74, ¶ 6).

Importantly, the assault was quickly stopped.  Medical staff at Newark examined T.C. and transported him to the hospital, where he received stitches to his lip.  (D. 74, ¶ 6) (D. 81, p. 2).  It is also significant that Newark removed the three assailants from unit 8 and placed T.C. under medical observation upon his return from the hospital.  Specifically, on July 20, he was placed in a medical observation/orientation unit ("orientation unit").[12]  (D. 132-1).  Whereas Newark staff had planned to transfer T.C. to a more permanent unit, he asked to stay in this unit because he felt safer there.  (D. 132-1).  Like all other Newark residents, T.C. is required to be in his cell from 9:00 p.m. to 8:00 a.m. and 2:00 p.m. to 3:15 p.m. for a shift change.[13]  (D. 132-1).

---

[11] The court credits this aspect of T.C.'s rendition of the assault as opposed to the government's description of T.C. repeatedly arguing with other residents about being on the telephone.  (D. 81, p. 2) (D. 86, ¶ 7).  Regardless, the assault does not give rise to special circumstances as discussed below.

[12] In addition to housing residents for medical observation, the unit functions as an orientation unit for newly-admitted Newark residents until they are medically cleared to transfer to a more permanent unit.  When such residents enter the orientation unit, residents in the unit are required to remain in their cell.  (D. 132-1).

[13] The court credits the Warden's averment that T.C., like all Newark residents, must remain in his cell from 9:00 p.m. to 8:00 a.m. and from 2:00 p.m. to 3:15 p.m. as opposed to T.C.'s averment that he is involuntarily committed to his cell for 18 to 19 hours a day.  (D. 132-1, 138).  To explain, T.C. has a strong

Separately, T.C. has a close relationship with both his aunt and uncle.[14]  (D. 69).  Like T.C.'s counsel and notwithstanding the distance, both his aunt and uncle have visited T.C. at Newark. (D. 86, ¶ 3).

During his residency at Newark, T.C. has been afraid for his safety.  At counsel's July 14 visit, he was tearful and anxious. (D. 65, ¶ 9).  Relatedly, T.C. has an assigned social worker at Newark to support his needs, ███████████████████████████ ███████████████████████████.  (D. 81) (referring to "T.C.'s assigned social worker"); (D. 121) (████████████████ ███████████████████████████████); (D. 122) (███████████████████████████████████████)  ███████████ ███████████████████████████████████████████ ███████████████████████████████.  (D. 121).  ███████ ███████████████████████████████████████████

---

interest in his release.  Further, he reports confinement to his cell for 21.5 hours since July 20 in an August 5 filing (D. 94) and reported at some point to Dr. Atkins confinement to his cell for 20 to 21 hours (D. 107).  To be sure, at one point the Warden stated that residents were confined between 1:00 p.m. to 2:00 p.m. for the shift change.  (D. 115-1).  The government asked for clarification, and the Warden thereafter averred the 2:00 p.m. to 3:15 p.m. time for the shift change.  (D. 132-1).  On balance, the court finds the Warden's averment more credible.

[14] Previously, as stated in the July 9 decision, the court found that T.C. did not share a close relationship with his aunt.  (D. 59, p. 26) ("Drawing reasonable inferences, T.C. does not appear to have a close relationship with his aunt.").  Based on a more fulsome record, including a July 11 letter to the court from T.C. (D. 69), the court finds that he shares a close relationship with his aunt and uncle.

████████████████████████████████████████████████

████████████████████████████.  (D. 107, 115-1, 122).

Newark's "Supervising Social Worker, Ms. Jones," has also "done

her best to watch over T.C. given the circumstances he faces," as

noted by T.C.'s counsel.  (D. 86, ¶¶ 6-7).  ████████████████

████████████████  Newark has medical staff available 24 hours a

day, seven days a week.  (D. 81, p. 2).

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████  ██████████████████

████████████████████████████████████████████████

████████████.  (D. 107).  ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████[15]

## IV.  DISCUSSION

### A.  Special Circumstances

As noted, T.C. argues that special circumstances exist

because Newark is not a suitable facility for juveniles and

---

[15] Additional facts are set out below where relevant to a particular argument.

████████████████████████████████████. (D. 74, ¶ 15).
On a broad level, he seeks release "to avoid physical assault,
psychological trauma, isolation from family, and distance from
counsel," which, he contends, constitute special circumstances.
(D. 86, ¶ 8). On a more granular level, as previously noted, he
identifies the following as special circumstances: (1) the July
18 assault; (2) the long distance of Newark from his counsel, aunt,
and uncle; (3) the inability to make direct calls to his father in
Türkiye without involving counsel; (4) housing pretrial detainees
with convicted youth offenders; (5) ████████████████████████
██████████████████████████████████████; and (6)
the extended and involuntary confinement to his cell with limited
access to the library and school. Examining these circumstances
seriatim leads to the conclusion that T.C. fails to show special
circumstances either singularly based on one of these
circumstances or in combination based on all of these
circumstances.

1. **July 18 Assault**

The July 18 assault does not constitute a special
circumstance. The assault was short-lived, resulted in relatively
minor injuries, and is highly unlikely to reoccur because of the
safeguards Newark enacted in response. Specifically, housing T.C.
in a different unit separate and apart from the three assailants

reduces the likelihood of another assault.[16]  Moreover, the record does not include any ongoing assaults on T.C. or, in fact, any other assault or attempted assault other than the July 18 assault. Simply stated, Newark has managed to impactfully control and reduce the threat posed by a future assault.

By analogy, medical conditions that are not debilitating and can be controlled in prison do not constitute special circumstances. *See In re Extradition of Huerta*, 2008 WL 2557514, at * 2 (finding no special circumstances because "federal authorities [able] to manage" extraditee's serious medical conditions" while extraditee was in their custody); *accord Matter of Extradition of Noeller*, 2017 WL 6462358, at *4.

In short, T.C.'s argument that the conditions at Newark imperil his physical safety based on the July 18 assault fail to persuade.  *See generally Hughes v. Judd*, 108 F. Supp. 3d 1167, 1243 (M.D. Fla. 2015) (finding average number of two fights week at pretrial detention facility not unconstitutional).

## 2.  <u>Distance</u>

Next, T.C. takes issue with the long distance of Newark from his counsel in Boston and his aunt and uncle in Amesbury.  The

---

[16] ███████████████████████████████████████████

driving distance between Newark and Boston or Amesbury is unquestionably long and, as his counsel suggest, would typically warrant an overnight stay in Newark.

The challenges, however, are manageable. Both T.C.'s counsel and his aunt and uncle were able to visit T.C. in Newark. Newark also allows counsel to use Zoom to meet virtually with a client. Further, the need to assist in preparing a defense with counsel is typically not a special circumstance. *See Drumm*, 150 F. Supp. 3d at 100 ("[N]eed to assist in defending against the extradition proceeding itself is not a special circumstance.") (citations omitted); *Matter of Extradition of Sidali*, 868 F. Supp. 656, 657 (D.N.J. 1994) ("[N]eed to consult extensively with an attorney over complex and important legal matters does not measure up to a 'special circumstance.'") (citation omitted); *see also Koskotas v. Roche*, 931 F.2d 169, 175 (1st Cir. 1991).[17]

In short, the challenges faced by counsel and T.C.'s aunt and uncle to meet in person with T.C. are inconvenient but far from insurmountable. Decidedly, they do not give rise to special circumstances.

---

[17] As stated in the July 9 decision, the court reiterates that it is not prepared to hold that counsel's inability to meet with a client could never amount to a special circumstance. (D. 59, p. 26).

### 3.  **Telephone Calls**

To continue, T.C. maintains that routing telephone calls  to his father through T.C.'s counsel violates his right as a juvenile to maintain contact with his family.[18]  (D. 74, n.1).  T.C. cites two cases[19] to assert a violation of his right to maintain family contact because of the inability to make direct phone calls to his father without counsel's involvement.

To begin, the court accepts the premise that a parent, such as the unwed father in *Stanley*, has a right to family unity and integrity under the Due Process Clause of the Fourteenth Amendment and, more germanely, under the Due Process Clause of the Fifth Amendment.  *See Stanley*, 405 U.S. at 651 ("The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Ninth Amendment.") (internal citations omitted); *M.G.U. v. Nielsen*, 325 F. Supp. 3d 111, 118 (D.D.C. 2018) (adjudicating preliminary injunction motion and

---

[18] As indicated previously, the record is not clear whether the Zoom phone calls still need to be routed through T.C.'s counsel.  The court will assume this remains the case.  Nevertheless, T.C. fails to show special circumstances.

[19] In particular, he cites:  *Stanley v. Illinois,* 405 U.S. 645, 651 (1972), a case involving the interference with an unwed father's custodial rights; and *Moore v. City of E. Cleveland*, 431 U.S. 494, 503 (1977), a case involving the categories of relatives that could live in a home.

concluding parent "is likely to succeed on her claim that her continued separation from her minor son . . . violates her substantive due process rights under the Fifth Amendment"). More, the court will assume arguendo that T.C., a minor in federal custody, has a similar right under the Due Process Clause of the Fifth Amendment. *See Jacinto-Castanon de Nolasco v. U.S. Immigr. and Customs Enforcement*, 319 F. Supp. 3d 491, 499 (D.D.C. 2018) (finding likelihood of success on preliminary injunction motion that separation of mother, absent a determination" she is unfit "parent or presents a danger to her sons, violates *their* right to family integrity under the Fifth Amendment") (emphasis added).

Even so, however, "[t]he right to family integrity has been recognized in only a narrow subset of circumstances." *Aguilar v. U.S. Immigr. and Customs Enf't Div. of Dept. of Homeland Sec.*, 510 F.3d 1, 23 (1st Cir. 2007); *see id.* at 24 n.7 (rejecting suggestion that petitioners "had the right to contact their family members immediately following their detention"). Furthermore, the limitation placed on direct phone calls between T.C. and his father is not a complete bar. *See United States v. Smalcer*, 464 Fed. Appx. 469, 471 (6th Cir. 2012) (explaining that supervised release "no-contact condition is not a complete bar to Smalcer's fundamental right of family association, thus providing further support for the restriction") (citing *United States v. Crume*, 422

F.3d 728, 734 (8th Cir. 2005)).  Rather, it simply requires T.C.
to contact his father through a phone call to his attorney, thus
making the phone call dependent on his attorney's availability.
It stands to reason that the inconvenience and difficulty of T.C.
calling his father by first calling T.C.'s counsel, who must stay
on the phone during the call, is not a special circumstance.

**4. <u>Housing T.C. in Same Unit as 18 to 21-Year-Old Individuals</u>**

Next, T.C. objects to housing 18 to 21-year-old individuals
in the same unit with him.  (D. 86, ¶ 5).  The practice, T.C.
contends, exposes him "to convicted offenders two, three, and
nearly four years older" and it "has proven dangerous to T.C."
(D. 86, ¶ 5).

First, although the court acknowledges T.C.'s concern about
his exposure to sentenced individuals a few years older than him,
the age range is not that great.  Second, as explained in the July
9 decision, housing charged and convicted youthful offenders in
the same unit is an unwelcome but not uncommon part of the
discomfort inherent in jail.  *See United States v. Williams*, 611
F.2d 914, 915 (1st Cir. 1979) ("[T]he discomfiture of jail" is
"not [a] special circumstance[].");  (D. 59, p. 26).  Third,
according to the Warden, under New Jersey law, individuals charged
as juveniles remain in juvenile custody at Newark until their case

19

is closed.[20]  It follows that T.C. fails to show that the practice
amounts to special circumstances.

**5.**  ██████████████████████

██████████████████████████████████████████████████

████████  constitute a special circumstance justifying his release.
He is mistaken.

First and foremost, the stress of detention is not a special
circumstance.  *See United States v. Risner*, No. 3:18-mj-765-BN,
2018 WL 6809796, at *20 (N.D. Tex. Dec. 17, 2018) ("rejecting
fugitive's claim that his [advanced] age, recent surgery,
medications, and the stress of detention warranted bail" (citing
*Matter of Extradition of Ricardo Alberto Martinelli Berrocal*, 263
F. Supp. 3d 1280, 1301 (S.D. Fla. 2017))); *United States v. Nolan*,
No. 08-M-97, 2009 WL 4544699, at *2 (N.D. Ill. Dec. 1, 2009)
(rejecting extraditee's "placement in solitary confinement, and
related concerns over his mental and physical health," as
warranting release based on special circumstances); *see also
Williams*, 611 F.2d at 915.

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

---

[20] The court credits this representation by the government even though the
government did not speak directly with the Warden.  (D. 81).

██████████████████████████████.[21]    T.C.  is  also  housed  with
convicted offenders up to and including the age of 21.  Against
the  backdrop  of  these  and  other  circumstances,  █████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████

    Newark, however, has taken precautions to reduce the risk of
any additional physical harm or threats from other inmates.  T.C.
is presently housed in the orientation unit apart from the three
assailants.  The government represents that the Warden will have
staff  at  the  classification  department  interview  T.C.  and
investigate the asserted threats of violence by other inmates.[22]
(D. 115-1).

██████████████████████████████████████████████████████████████

████████████████████████████████████████.  (D. 115-1).  ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████     (D.  122).  The government represented in
late August that it had requested information from the Warden about

---

[21] ███████████████████████████████████████████████████████████
█████████████████████████     ██████████████████████████████████

[22] To the extent this has not been done, the court suggests that the government
inquire when and if the interview and investigation will occur as well as update
T.C.'s counsel about the status.

how T.C. can make a request and would provide the information to T.C.'s counsel.  (D. 115-1).



As such, it is not a special circumstance.

## 6.  **T.C.'s Involuntary Confinement to His Cell**

As explained, T.C. is only confined to his cell from 9:00 p.m. to 8:00 a.m. and from 2:00 p.m. to 3:15 p.m. for a shift change.  Here again, this is an ordinary and common requirement of the discomfort of being in jail.  *See Williams*, 611 F.2d at 915. It falls well short of a special circumstance.

In sum, none of the various conditions and circumstances at Newark that T.C. identifies constitutes a special circumstance. Although the court considered the various conditions and circumstances at Newark in a compartmentalized fashion, the court also concludes that all of the condition and circumstances

considered in combination as a group do not amount to special circumstances.  In conclusion, T.C. bears the burden of showing special circumstances and he fails to do so.[23]

## B. <u>Constitutional Violations</u>

T.C. next argues summarily that the conditions of confinement at Newark violate his Sixth, Fifth, and Eighth Amendment rights. T.C. fails to show a violation of the Sixth Amendment because the right to counsel applies "in criminal cases." *Romeo v. Roache*, 820 F.2d 540, 543-44 (1st Cir. 1987).  "Extradition proceedings . . . are generally not considered criminal prosecutions." *Id.*

The Eighth Amendment does not apply because T.C. is not a convicted inmate.  Whereas the Due Process Clause of the Fourteenth Amendment hews to the same standard, *see Latimore v. Trotman*, 651 F. Supp. 3d 366, 373 n.7 (D. Mass. 2023) (noting Eighth Amendment protects convicted inmates but "substance of the protection is the same" under Fourteenth Amendment) (citation omitted), T.C. is not

---

[23] Because of the absence of special circumstances, it is not necessary to address the risk of flight risk. *See In re the Extradition of Kyung Joon Kim*, No. CV 04-3886-ABC, 2004 WL 5782517, at *6 (C.D. Cal. July 1, 2004) (Finding no special circumstances to justify bail, "the Court need not address the issue of flight risk, since without special circumstances bail is not available."); *see also Matter of Extradition of Schumann*, No. 18 CR 283, 2018 WL 4777562, at *6 (N.D. Ill. Oct. 3, 2018) (Even if extraditee could show he was not a risk of flight, "bail would be warranted only if he present[ed] 'special circumstances.'") (citation omitted).  Whereas the court acknowledges T.C.'s request to address whether conditions of release can abate any perceived risk of flight (D. 74, ¶ 16), the complete absence of special circumstances renders it unnecessary.

in state custody.  Rather, T.C. is in federal custody awaiting a hearing on the extradition request.  As such, he is analogous to a federal pretrial detainee awaiting trial to which the Fifth Amendment's Due Process Clause applies.  *See Baez v. Moniz*, 460 F. Supp. 3d 78, 88 (D. Mass. 2020) (stating that for federal detainees awaiting trial, claims arise under Fifth Amendment's Due Process Clause rather than Eighth Amendment).

That said, regardless of whether the Eighth or Fifth Amendment applies, the standard is similar.  *See id.* at 88.  As astutely explained in *Baez*:

> First Circuit precedent describes the [Fifth Amendment and the Eighth Amendment] standards as "not all that far apart," with both leaving "ample room for professional judgment, constraints presented by the institutional setting, and the need to give latitude to administrators who have to make difficult trade-offs as to risks and resources." *Battista v. Clarke*, 645 F.3d 449, 453 (1st Cir. 2011); *see Savino* [*v. Souza*, 459 F. Supp. 3d 317, 327-329 & n.16 (D. Mass. 2020)] (assessing Fifth Amendment claim of immigration detainees under "deliberate indifference" standard and discussing state of First Circuit decisions in this area); *Couchon v. Cousins*, No. 17-cv-10965, 2018 WL 4189694, at *6 (D. Mass. Aug. 31, 2018) (finding First Circuit precedent did not permit District Court to apply standard other than "deliberate indifference" to Fifth Amendment claim involving challenge to conditions of confinement).

*Baez*, 460 F. Supp. 3d at 88.

T.C.'s single-sentence argument that the conditions at Newark violate his Fifth Amendment right fails to persuade.  In that regard, and crediting the Warden's representations, T.C. is

confined to his cell from 9:00 p.m. to 8:00 a.m. and then from 2:00 p.m. to 3:15 p.m. Outside of these times, he is free to leave his cell, according to the Warden. ███████████████████ ██████████████ and he can attend school, which resumed after an August 16 to September 5 recess, per the Warden. Other than the July 18 assault, T.C. does not report any further altercation and verbal threats, even if true, do not violate the Fifth Amendment. *See Chin v. Warfel*, Civil Action No. 23-4220 2024 WL 665536, at *4 (E.D. Pa. Feb. 15, 2024) ("A constitutional claim based only on verbal threats will fail, moreover, whether it is asserted under the Eighth Amendment's ban on cruel and unusual punishment or under the Fifth Amendment's substantive due process clause." (citing *Maclean v. Secor*, 876 F. Supp. 695, 699 (E.D. Pa. 1995))). Accordingly, T.C. fails to show a violation of his Fifth Amendment right to due process. Alternatively, he fails to adequately develop and therefore waives the argument of a Fifth Amendment violation. In either instance, the "argument" that the conditions of confinement at Newark violate T.C.'s Fifth Amendment right to due process is unavailing.

C. **Transfer to Mass DYS**

As a final matter, T.C. asks the court to use its authority under section 3184 to transfer him to Mass DYS if the court does not release him to the custody of his aunt and uncle. Quoting

section 3184, T.C. emphasizes that the "court 'shall issue his warrant for the commitment of the person so charged to **the proper jail**, there to remain until such surrender shall be made." (D. 74, ¶ 17). In effect, T.C. argues that Newark is not the proper jail, which impels the court to transfer him to Mass DYS as the proper jail. Other than the statute, T.C. provides no case law to support his argument that section 3184 requires a transfer to another jail as the proper jail. Regardless, for many of the reasons stated in section IV(A), he court concludes that Newark is the proper jail. T.C.'s request is therefore denied.

T.C. also objects to the Marshal's reluctance to transfer him to Mass DYS because of the expense. (D. 65, ¶ 14). Citing 18 U.S.C. § 3195 ("section 3195"), T.C. contends that the objection based on expense is meritless because the statute requires Türkiye to pay the cost of T.C.'s detention in Massachusetts. (D. 65, ¶ 14). The language of section 3195 states that Türkiye bears the cost "incurred in any extradition proceeding in apprehending, securing, and transmitting" T.C. 18 U.S.C. § 3195.

The government points out that article 19 of the Treaty governs the cost of detention and it requires the United States to pay the cost. (D. 68) (citing *Whitney v. Robertson*, 124 U.S. 190, 194 (1888)). The government is correct.

26

When a treaty and a statute "relate to the same subject," courts construe the documents "to give effect to both, if that can be done without violating the language of either" document. *Greci v. Birknes*, 527 F.2d 956, 960, n.9 (1st Cir. 1976) (quoting *Whitney*, 124 U.S. at 194). However, "if the two are inconsistent, the one last in date will control the other." *Id*. (quoting *Whitney*, 124 U.S. at 194). Article 19 plainly states that, "Expenses in the territory of the Requested Party [the United States] for processing the extradition request for the person sought shall be borne by that Party *until* surrender. The expenses *after* surrender shall be borne by the Requesting Party," Türkiye. (D. 12, p. 23) (emphasis added). The Treaty postdates section 3195, which was enacted in 1948. Hence, to the extent there is any conflict with section 3195, the Treaty controls. Because T.C. has not yet been surrendered to Türkiye, the United States, as the requested party, bears the expense of processing the extradition request, which encompasses the cost of housing him in Newark or Mass DYS. As a result, T.C.'s argument regarding expense fails to persuade.

In conclusion, the conditions and circumstances of T.C.'s confinement at Newark are not standing alone, or in combination, special circumstances. T.C.'s constitutional arguments do not

warrant his release, and a transfer to Mass DYS as "the proper jail," 18 U.S.C. § 3184, lacks merit.

**V.   CONCLUSION**

For the reasons explained above, the emergency motion to reconsider the order denying release and refusal by Manson to take custody (D. 74) is **DENIED**.


/s/ Donald L. Cabell
DONALD L. CABELL, Chief U.S.M.J.


DATED:  September 26, 2024

28