**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

IN THE MATTER OF
EXTRADITION OF T.C.

No. 24-MJ-01365-DLC

**ORDER ON RELATOR'S EXTRADITION AND ON**
**RELATOR'S MOTION TO DISMISS**

CABELL, Chief U.S.M.J.

The United States has filed a complaint seeking to extradite relator T.C. ("T.C.")[1] to the Republic of Türkiye ("Türkiye") for the crime of causing reckless killing and injury under article 85/2 of the Criminal Code of Türkiye ("article 85"), in accordance with an extradition treaty between the United States and Türkiye ("the Treaty").[2]  T.C. moves to dismiss the complaint.  (D. 87). Now, having conducted an extradition hearing under 18 U.S.C. § 3184 ("section 3184"), the court denies the motion to dismiss and will certify the relator's extradition to the Secretary of State.

---

[1] The relator is referred to using abbreviations where he was a minor when this matter commenced.

[2] Treaty on Extradition and Mutual Assistance in Criminal Matters Between the United States of America and the Republic of Turkey, U.S.-Turk., June 7, 1979, 32 U.S.T. 3111 (the "Treaty").

## I.   <u>SUMMARY OF THE PARTIES' ARGUMENTS</u>

The extradition complaint alleges that T.C. was driving at a high rate of speed and struck some bystanders, causing the death of one of them, "O.M.A."[3]  T.C. raises two principal arguments in seeking to dismiss the complaint.

First, T.C. argues that he cannot be found to have violated article 85 because O.M.A.'s death did not result from his conduct but rather resulted from the failure of emergency responders and medical staff to provide the victim timely medical care. Consequently, their conduct was an intervening and superseding cause of O.M.A.'s death which broke the causal chain to T.C.  As such, T.C. argues that even accepting that he drove the vehicle that struck O.M.A., his conduct was not the "proximate cause" of O.M.A.'s death.

Second, he argues that section 3184 and the Treaty do not contemplate, and thus do not authorize, his extradition.  He argues that the Treaty as framed envisions that an extradition request will rest on an indictment or a formal charge.  This matters, T.C. argues, because he is merely wanted for questioning and has not formally been indicted or charged with a crime.  The record does

---

[3] The parties refer to the decedent and the other individuals at the scene by their initials presumably to protect their identities.  The court follows suit.

include an arrest warrant but T.C. maintains that the warrant is not a substitute for a formal charge. In that regard, the Treaty requires the United States to surrender persons "who are being prosecuted for or have been charged with an offense," and an arrest warrant does not satisfy this language, according to T.C. Regarding section 3184, T.C. maintains similarly that the statute's use of the terms "charged" and "charging" requires the existence of criminal charges as a prelude to an extradition.

The government counters that the arrest warrant is enough to satisfy the Treaty and in support cites a First Circuit decision, *Aguasvivas v. Pompeo*, 984 F.3d 1047, 1060 (1st Cir. 2021), as well as decisions from the Second, Fourth, Seventh, and Ninth Circuits.[4] As to probable cause, the government maintains that the record amply establishes probable cause that T.C. legally was responsible for the victims' injuries. Relatedly, the government points out that T.C. relies on "proximate cause" as an element of the article 85 offense when, in fact, the language only refers to a "person who causes the death." Lastly, it responds that T.C.'s argument

---

[4] T.C., in turn, submits that the *Aguasvivas* decision supports his position. (D. 87) ("The bigger problem arises from the omission in the extradition request of any indictment or the like. To be more precise, such a document was not simply omitted -- it does not exist at all, as the parties agree that the Dominican prosecutor has yet to seek an indictment") (quoting *Aguasvivas*, 984 F.3d at 1057); (D. 155) ("Extradition cannot be sought for 'a possible, yet-to-be-determined prosecution.'") (quoting *Aguasvivas*, 984 F.3d at 1058).

that first responders should have taken T.C. to a closer hospital or that medical staff delayed treatment constitutes an affirmative defense that would be reserved for a Türkish court to consider.

## II.  <u>LEGAL STANDARD</u>

Section 3184 "establishes a two-step procedure which divides responsibility for extradition between a judicial officer," including an authorized magistrate judge, "and the Secretary of State." *United States v. Kin-Hong*, 110 F.3d 103, 109 (1st Cir. 1997). Based on a complaint initiated by "the Department of Justice in response to [a] foreign government's request," the judicial officer issues an arrest warrant for the targeted individual. *Aguasvivas*, 984 F.3d at 1050; 18 U.S.C. § 3184. Thereafter, the judicial officer "conducts a hearing to consider whether the extradition request complies with the relevant treaty's documentation requirements, and whether 'the evidence [is] sufficient to sustain the charge under the provisions of the proper treaty.'" *Aguasvivas*, 984 F.3d at 1050 (citation omitted). Certification of the matter by the judicial officer to the Secretary of State is in order when:

> (1) the judicial officer is authorized to conduct the extradition proceeding; (2) the court has jurisdiction over the fugitive; (3) the applicable treaty is in full force and effect; (4) the crime(s) for which surrender is requested is/are covered by the applicable treaty; and (5) there is sufficient evidence to support a finding of probable cause as to each charge for which extradition is sought.

*Matter of Extradition of Taylor*, 484 F. Supp. 3d 13, 15 (D. Mass. 2020) (citing *Fernandez v. Phillips,* 268 U.S. 311, 312 (1925)); *accord Matter of Extradition of Koželuh*, 610 F. Supp. 3d 1066, 1075-76 (E.D. Tenn. 2022); 18 U.S.C. § 3184.

## III.  **BACKGROUND**

### A.  **The Accident**

On the evening of March 1, 2024, D.O.O., driving his father's Volvo with two passengers (P.T.E. and Z.H.D.), arrived at the residence of T.C., his friend.  (D. 12, p. 136).  T.C., driving a Porsche, and D.O.O., driving the Volvo, then left the area whereupon D.O.O. picked up K.A. and Y.E. and thereafter M.E.Y. (D. 12, pp. 130-131, 136-137).  D.O.O. also stopped at a liquor store.  One of the individuals went into the liquor store to buy cigarettes.  When he returned, the group got back into the Volvo and the Porsche and left the area.  (D. 12, pp. 136-137).  D.O.O. also stopped for gas at a Shell station.  (D. 12, pp. 131, 135, 137, 139) (D. 70-3, p. 40).  No person within the group reported to authorities that T.C. was intoxicated.  (D. 12, p. 99).

Shortly before midnight, the two cars entered a two-lane, two-way road with a speed limit of 30 kilometers per hour (approximately 18 miles per hour).  (D. 12, pp. 97-98, 112).  T.C. was driving the Porsche with three passengers:  A.K. in the front

seat along with A.A. and B.A in the back seat.  (D. 12, p. 98) (D. 70-3, p. 40).  With the Volvo leading the way, T.C. "suddenly accelerated" and passed the Volvo.  (D. 12, p. 135).  After passing the Volvo, T.C. "increased the speed of the [Porsche] considerably."  (D. 12, p. 137).

As he came to the bend in the road, he turned the corner at an excessive speed well above the speed limit.  (D. 12, p. 129); (D. 12, pp. 135, 137) (D.O.O. and A.A. describing that T.C. entered the turn "too quickly"); (D. 12, p. 113) (T.C. "did not lower the speed of the car.").  As he did so, he hit three ATVs parked on the side of the road and five individuals.  One of those individuals, O.M.A., died.  (D. 12, pp. 121-122, 129, 131, 135, 137).  The ATVs were parked on the side of the road because one of them had broken down.  (D. 12, p. 122).

Understandably distraught, T.C. got out of the Porsche, as did the other passengers.  (D. 12, pp. 131, 133, 137).  Two witnesses heard him say, "My life is over."  (D. 12, pp. 133, 135). Another witness saw several injured individuals lying on the road. T.C. "shouted, 'There was another person under the [Porsche],' and asked for help."  (D. 12, pp. 131, 137).  He also telephoned his private driver and his mother (Eylem Tok), telling both that he had gotten in an accident.  (D. 12, pp. 131, 137).

A fire truck arrived.  Tok arrived thereafter in a vehicle with another woman.  (D. 12, p. 131).  T.C., along with two of his friends, got into this vehicle whereupon the group, including Tok, drove away.  Less than three hours after the accident, T.C. and Tok are seen in a photograph passing through airport security at the Istanbul airport.  (D. 12, p. 141).  They departed on a 3:50 a.m. flight to Cairo and, from there, flew to the United States. (D. 12, pp. 96, 143-144).

**B.**   **The Investigation and/or Prosecution**

After the accident, the İstanbul Chief Public Prosecutor's Office began an investigation into T.C.'s alleged commission of the article 85 offense.[5]  (D. 12, pp. 95, 101).  The extradition file includes statements given to the Turkish police by passengers in the Porsche and the Volvo, the driver of the Volvo, and several of the injured ATV riders.

---

[5] Article 85 reads as follows:

> (1) Any person who causes the death of another by reckless conduct shall be sentenced to a penalty of imprisonment for a term of two to six years.

> (2) If the act results in the death of more than one person, or the injury of one or more persons together with death of one or more persons, the offender shall be sentenced to a penalty of imprisonment for a term of two to fifteen years.

(D. 12, p. 95).

A few weeks after the accident, the prosecutor provided a detailed recitation of the facts and the evidence regarding the commission of the article 85 offense ("prosecutor's report").  The body of the report notes "the investigation[] carried out by [the] Chief Public Prosecutor's Office."  (D. 12, p. 96).    The concluding paragraph repeats this statement.  Of note, the paragraph requests T.C.'s extradition "so that the investigation against [T.C.] can be concluded."  (D. 12, p. 101).

Pertinent to causation, the prosecutor described an examination of O.M.A.'s body that he and a doctor performed. Relative thereto, the prosecutor stated the following:

> [I]t was detected that there were intense blood tissue and fractured bone tissue on [O.M.A.'s] left foot.  Intense bleeding from his nose area was detected.  Scratches and ecchymosis, arising from the impact, were detected on his left hip, left shoulder and right rib . . . Following the post-mortem examination, it was reached to the conclusion that [O.M.A.] died to the internal bleeding arising from the impact[] he had due to the accident.  *A decision for autopsy was rendered to determine the certain cause of death and a detailed report is expected.*

(D. 12, p. 96) (emphasis added).[6]

---

[6] As argued at the hearing, T.C. submits that the prosecutor should be asked or required to produce the autopsy report.  T.C. reasons that the report will resolve an uncertainty about causation, specifically, the existence of a supervening cause when the first responders took O.M.A., who suffered only a broken leg, to the distant hospital notwithstanding the existence of closer hospitals in Istanbul.  T.C. emphasizes that it has been *seven* months since the accident, and the autopsy report, which would "determine the certain cause of death," has yet to be produced.

The argument lacks merit.  "[I]n an extradition proceeding, discovery is not only discretionary with the court, it is narrow in scope."  *Koskotas v. Roche*,

As part of the investigation, a mechanical engineer prepared an expert report. He determined that the Porsche "entered the bending part of the road . . . at a very high speed (estimated 170-180 [kilometers per hour]) and crashed into [the] ATV vehicles and [the] people on the side of the road at the exit point of the bend." (D. 12, p. 129). Concordantly, he concluded that "the incident occurred due to exceeding the 30" kilometer speed limit. (D. 12, p. 129).

Correspondingly, a forensic traffic expert concluded that T.C. violated several traffic laws. One of the laws the expert cited was Article 52/1-b, which requires drivers to adapt their speed to the characteristics of their vehicle and to the conditions

---

931 F.2d 169, 175 (1st Cir. 1991). Specifically, it is within the court's discretion to allow "the relator to offer limited, explanatory evidence" in order to afford the "relator the opportunity to present reasonably clear-cut proof which would be of limited scope and have some reasonable chance of negating a showing of probable cause." *Id.* Relative to causation, and contrary to T.C.'s position, O.M.A.'s injuries were extensive. (D. 12, p. 96) (describing the injuries, as quoted above, as showing "intense blood tissue and fractured bone tissue" from left foot, "[i]ntense bleeding from [O.M.A.'s] nose area . . . and [s]cratches and ecchymosis, arising from the impact" on "left hip, left shoulder and right rib"). The autopsy report is unlikely to provide sufficient evidence of a supervening cause to refute or materially weaken probable cause given, inter alia, the severity of these injuries. Further, the risk of expanding these proceedings into a minitrial about intervening causation is real. *See id.* ("[E]xtradition proceedings are not to be converted into a dress rehearsal trial.") (citations omitted). Lastly, this court's role is not to determine whether Turkish law provides for intervening causation as absolving T.C. of committing the article 85 offense except as necessary to ensure compliance with section 3184 and the Treaty. *See Taylor v. McDermott*, 516 F. Supp. 3d 94, 104 (D. Mass. 2021); *Taylor*, 484 F. Supp. 3d at 18 (recognizing that "[e]xtradition proceedings are not vehicles for United States federal courts to interpret and opine on foreign law") (citations omitted).

of the road, weather, visibility, and traffic.[7]  (D. 12, pp. 114-115).  In that regard, the Porsche driven by T.C. is a high-performance sports car.  (D. 12, p. 98).  Given these and other circumstances denoted in the report, the forensic expert attributed "the primary fault in the occurrence of [the] accident" to T.C.  (D. 12, p. 115) (emphasis and capitalization omitted).  The expert deemed the drivers of the three ATVs as having "the secondary fault in the occurrence of the accident."  (D. 12, p. 115) (emphasis and capitalization omitted).  Their fault stemmed from violating another traffic law requiring a red-light device or red reflector in the front and back of a broken-down vehicle.  (D. 12, p. 115).

Importantly, throughout the prosecutor's report, the prosecutor outlined conduct by T.C. that firmly supported that he committed the offense, including engaging in reckless conduct.[8]  (D. 12, pp. 98-99) (summarizing passengers' and Volvo driver's statements of T.C. exceeding speed limit, "constantly driving fast[,] and taking corners hard"); (D. 12, p. 98) (T.C.'s passengers told him "to slow down" but "he did not listen."); (D.

---

[7] On the night of the accident, the weather was clear, and the asphalt road was dry.  (D. 12, pp. 97, 112).

[8] The court makes this statement solely for purposes of extradition and, in particular, the assessment of "sufficient evidence to sustain the charge."  18 U.S.C. § 3184.  The court has not and does not make a finding on the merits.

12, p. 98) (reciting B.A.'s statement that, "We fastened our
seatbelts in case"); (D. 12, p. 96) (T.C. took the "corner on
extreme high-speed[,]" skidded the vehicle, and hit the five ATV
riders "stopped at the side of the road . . . ."); (D. 12, p. 99)
("[I]t has been concluded that the accident occurred as a
consequence that [T.C.] exceeded the speed limit and could not
take the bend he entered, and thereby skidding the vehicle and
crashing the persons standing still on the right side of the
road."); (D. 12, p. 96) ("Due to the accident, [O.M.A.] died and
other individuals were injured."); (D. 12, p. 99) ("For these
reasons, it has been understood that [T.C.] . . . caused the death
of one person and the injury of others . . . .").

On July 3, 2024, a judge of the İstanbul 7th Criminal
Judgeship of Peace issued an arrest warrant for T.C. based on the
article 85 offense of causing reckless killing and injury.  (D.
12, pp. 100, 151).  In the context of issuing the warrant, the
judge examined "the investigation file" and noted "the existence
of strong suspicion" that T.C. "committed the offence" proscribed
by article 85 "and there has been reason for detention."  (D. 12,
p. 149).  The warrant explicitly identifies the "*Offence Charged
Against the Accused*" as "causing Reckless Killing and Injury" under
article 85.  (D. 12, p. 151) (emphasis added).  Further, the judge
stated in the arrest warrant that, "By taking into consideration

the sanctions . . . for the offence . . ., [the] upper limit of the penalty and [the] concrete evidence in the file pointing to commission of the offence by [T.C.], it has been decided to issue an arrest warrant for [T.C.] to detain him . . . ."  (D. 12, p. 149).  When arrested, and if T.C. could not be taken to the Chief Public Prosecutor's Office within 24 hours, the warrant states that the investigation prosecutor shall be contacted to take T.C.'s statement such that "interrogation will be evaluated."  (D. 12, p. 151) (capitalization omitted).

C.  <u>**Events in the United States and T.C.'s Arrest**</u>

On March 2, 2024, T.C. and Tok arrived in the United States. (D. 12, pp. 143-144).  In early May, a magistrate judge of the United States District Court in the Southern District of Florida attested to her review of a complaint against T.C. seeking his extradition.  The duly sworn complaint, filed by an assistant United States attorney, requested T.C.'s arrest and the magistrate judge issued an arrest warrant.  (D. 5-1).  It states that, "According to information provided by the government of Türkiye, T.C. is wanted for *prosecution on a charge* of Causing Reckless Killing and Injury, in violation of and punishable by Articles 85/2 and 31/3 of the Criminal Code of Türkiye."  (D. 5-1) (emphasis added).

On June 14, 2024, T.C. was arrested near Boston, brought before this court for his initial appearance, and has been detained since that time.

## IV.  DISCUSSION

As noted, the government requests that the court certify to the Secretary of State that T.C. is extraditable to Türkiye on the article 85 offense.  T.C. in addition argues that certain wording in the extradition statute, 18 U.S.C. § 3184, bars his extradition. The court first examines whether each of the five elements to certify T.C.'s extradition is satisfied, *see Taylor*, 484 F. Supp. 3d at 15, and then addresses his argument concerning section 3184.

### 1.  Consideration of the Five Extradition Elements

### A.  Authority of the Court

The court's authority over this extradition dispute is well established.  The undersigned is a federal magistrate judge and section 3184 permits "any magistrate judge authorized to do so by a court of the United States" to hear and consider the evidence of the fugitive's criminality.  18 U.S.C. § 3184.  Rule 1(e) of the Rules for United States Magistrate Judges in the United States District Court for the District of Massachusetts empowers magistrate judges in this district to "[c]onduct extradition proceedings, in accordance with [section 3184]."  D. Mass. Local Magistrate Judge Rule 1(e).  Further, under 28 U.S.C. § 636(a)(1),

a magistrate judge has "all powers and duties conferred or imposed
upon United States commissioners by law."  28 U.S.C. § 636(a)(1).
Prior to the enactment of this statute, United States commissioners
conducted extradition proceedings.  *Austin v. Healey*, 5 F.3d 598,
602 (2d Cir. 1993); *accord Matter of Extradition of D'Monte*, Case.
No. 22-mj-230(MDM), 2023 WL 7402921, at *9 (D.P.R. Nov. 9, 2023)
(finding it "well-settled that . . . magistrate judges . . . may
render a certification under § 3184") (citing *Austin*, 5 F.3d at
601-602).  In sum, the court finds it is authorized to preside
over the present matter.

## B.  Jurisdiction Over T.C.

The parties agree, and the court so finds, that the court has
jurisdiction over T.C. where he was arrested in this district.  It
is well established that a court has jurisdiction over a fugitive
who is located and arrested in the court's district.  *See Matter
of Extradition of Lalama Gomez*, 24-MJ-458(LKE), 2024 WL 4646959,
at *4 (E.D.N.Y. Nov. 1, 2024); *Matter of Extradition of Smyth*, 24-
mc-00084-JCN, 2024 WL 2093460, at *2 (D. Me. May 9, 2024) (noting
Smyth's arrest in District of Maine and that "Court may conduct
extradition proceedings for any person found within the Court's
jurisdiction") (citing section 3184); *accord Pettit v. Walshe*, 194
U.S. 205, 219 (1904) ("[C]ommissioner or judicial officer here
referred to is necessarily one acting as such within the state in

which the accused was arrested and found.") (interpreting predecessor statute to section 3184 with similar language). Here, T.C. was located and arrested near Boston on June 14. As such, the court has personal jurisdiction over him.

**C. <u>Treaty in Full Force and Effect</u>**

The parties agree that the Treaty between the United States and Türkiye was in full force and effect at all relevant times. By declaration, Tom Heinemann, an attorney advisor in the Office of Legal Advisor for the United States Department of State, attests that the Treaty is in full force and effect. (D. 70-1). Consistent with this declaration, the court finds that the Treaty was and remains in full force and effect for purposes of the extradition proceeding.

**D. <u>Offense Covered by the Treaty</u>**

T.C. argues that article 85 is not covered by the Treaty. Specifically, he submits that the plain language of the Treaty requires the United States to surrender persons "who are being prosecuted for or have been charged with an offense," and an arrest warrant does not satisfy this language. Before turning to his argument, which is based on Articles 1 and 7 of the Treaty, the court first examines whether article 85 satisfies the Treaty's dual criminality provision, that is, whether the offense for which extradition is sought is a crime in both countries. *See, e.g.,*

*Taylor*, 484 F. Supp. 3d at 16 (determining whether "charges for which extradition is sought [were] crimes" under "both Japanese and United States law and covered by" treaty under this fourth element); *accord D'Monte*, 2023 WL 7402921, at *8, *10 (ascertaining whether treaty covers offense for which extradition is sought entails "determining whether an offense is punishable under the laws of both countries"); *see also Matter of Extradition of Manzi*, 888 F.2d 204, 207 (1st Cir. 1989) ("[E]ach element of the offense purportedly committed in a foreign country need not be identical to the elements of the similar offense in the United States.") (citation omitted).

Article 2 of the Treaty addresses extraditable offenses. These include:  (1) "Offenses, regardless of whether listed in the Appendix to this Treaty or not, which are punishable under both the federal laws of the United States and the laws of Turkey by deprivation of liberty at least for a period exceeding one year or by a more severe penalty" (Treaty, Art. 2(1)(a)); or (2) "Offenses listed in the Appendix to this Treaty which are punishable under both the laws of the Requesting Party and the Requested Party for at least a period exceeding one year or by a more severe penalty" (Treaty, Art. 2(1)(b)).  (D. 12, p. 8); *see, e.g., D'Monte*, 2023 WL 7402921, at *10 (examining offenses for which extradition sought

based on whether fugitive's conduct punishable by more than one year under laws of both countries).

These provisions encompass dual criminality, a central requirement of extradition law. *See Matter of Extradition of Manzi*, 888 F.2d 204, 207 (1st Cir. 1989) (interpreting similar language as requiring extraditable offense to be "crime under the laws of both contracting countries," a principle "'central to extradition law'") (citation omitted). Pertinent to dual criminality, "[i]t is enough if the particular act charged is criminal in both jurisdictions." *Collins v. Loisel*, 259 U.S. 309, 312 (1922); *Manzi*, 888 F.2d at 207 ("'[D]ouble criminality' requires only 'that the acts upon which the charges are based are proscribed by similar provisions of federal" or state laws) (ellipses omitted). Further, the law "does not require that the name by which the crime is described in the two countries . . . be the same; nor that the scope of the liability . . . be coextensive." *Collins*, 259 U.S. at 312.

The article 85 offense easily qualifies as an extraditable offense under Article 2. Regarding the acts upon which the article 85 offense is based, T.C.'s conduct entailed driving a Porsche at more than five times the speed limit late at night on a two-lane road and not listening to requests by passengers in the Porsche to slow down. The prosecutor's report details T.C.'s conduct

including exceeding the speed limit.  Unable to take the bend in the road, the Porsche skidded and crashed into the ATV riders standing on the side of the road.  Although not intentional, such conduct was nonetheless reckless.  The prosecutor's report further describes T.C.'s conduct as causing the death of O.M.A. and injuries to the four other ATV riders.[9]  The foregoing conduct is criminal under Turkish law, as explained in detail in the prosecutor's report.  *See D'Monte*, 2023 WL 740291, at *10 (discussing dual criminality anent Canadian extradition request and noting Canadian prosecutor's affidavit explaining Canadian law as applicable to D'Monte's conduct).

Further, such conduct, if committed in the United States, is proscribed under federal law as involuntary manslaughter.  18 U.S.C. § 1112(b) (defining manslaughter as "unlawful killing of a human being without malice").  Relative to Article 2(1)(b), the appendix lists "manslaughter" as an extraditable offense.[10]

Also in accordance with Article 2(1)(b), the offenses are punishable for at least a period of one year or by a more severe penalty under the laws of the United States and Türkiye.  The federal involuntary manslaughter offense is punishable by up to

---

[9] Again, the court makes the above findings solely for purposes of extradition.

[10] T.C. does not challenge the government's reliance on involuntary manslaughter under federal law anent proscribing the conduct as criminal.

eight years in prison.  18 U.S.C. § 1112.  If charged as a juvenile delinquent under federal law, T.C., who was born in June 2007, could be punished with "official detention" until he reaches the age of 21, i.e., approximately four years.  18 U.S.C. § 5031 (defining "juvenile delinquency" as violation of United States law "committed by a person prior to his eighteenth birthday which would have been a crime if committed by an adult"); 18 U.S.C. § 5037(c)(1)(A) (setting term of official detention for "juvenile who is less than eighteen years old" as up to the date he "becomes twenty-one years old").

In Türkiye, the article 85 offense is punishable by two to 15 years imprisonment when it results in "the injury of one or more persons together with death of one or more persons."  The penalty is "reduced by one-third" under article 31/3 of the Criminal Code of Türkiye where, as here, the defendant is older than 15 years and younger than 18 years at the time of the offense, meaning T.C. would appear to be subject to up to ten years imprisonment under Turkish law.  (D. 12, pp. 95-96)

Having thus determined that article 85 is an extraditable offense, the court turns to T.C.'s arguments relative to Articles 1 and 7.  As indicated, Article 1 requires the United States to surrender persons "who are being prosecuted for or have been charged with an offense."  T.C. initially submits that the language

in Article 1 is plain and unambiguous.  Asserting that he is not *being* prosecuted and that there is no formal or active charge against him, he maintains he is only being investigated.[11]  He submits that a mere investigation for allegedly committing the article 85 offense falls outside the above language in Article 1. In short, so he argues, Türkiye seeks his extradition to take his statement, as noted in the arrest warrant, "so that the investigation can be *concluded*," as stated by the Turkish prosecutor (the "prosecutor") in his report.  (D. 12, pp. 101, 151) (emphasis added).  In that vein, T.C. argues that his extradition cannot be sought for "a possible, yet-to-be-determined prosecution."  (D. 155, p. 1) (quoting *Aguasvivas*, 984 F.3d at 1058).[12]

T.C.'s argument invokes principles of treaty interpretation. "The interpretation of a treaty, like the interpretation of a statute, begins with its text." *Medellín v. Texas*, 552 U.S. 491, 506-07 (2008) (citing *Air France v. Saks,* 470 U.S. 392, 396-397 (1985)).  If, however, a "treaty's text is ambiguous and reasonably

---

[11] Consistent with an investigation, or so T.C. contends, the arrest warrant seeks to take and evaluate T.C.'s statement.  (D. 12, p. 151).  Further, he points out that unless he appears before a judge within a day of the arrest, the *investigating* prosecutor will take his statement, as stated in the warrant.

[12] In full, the language, which is dicta, states that "this case concerns a request to extradite for arrest and questioning in anticipation of a possible, yet-to-be-determined prosecution." *Aguasvivas*, 984 F.3d at 1058.

accommodates" the government's construction, the court "defers to that construction . . . ." *Aguasvivas*, 984 F.3d at 1058; *see also Kin-Hong*, 110 F.3d at 110 ("[E]xtradition treaties, unlike criminal statutes, are to be construed liberally in favor of enforcement" and, if "treaty fairly admits of two constructions, . . ., the more liberal construction is to be preferred") (citing *Factor v. Laubenheimer*, 290 U.S. 276, 293-294 (1933), and *United States v. Howard*, 996 F.2d 1320, 1330-1331 (1st Cir. 1993)). "Conversely, if the textual meaning is plain and cannot reasonably bear the government's construction," the court "must reject that construction." *Aguasvivas*, 984 F.3d at 1058.  Relatedly, courts "give 'the specific words of [a] treaty a meaning consistent with the shared expectations of the contracting parties.'" *BG Group, PLC v. Republic of Argentina*, 572 U.S. 25, 37 (2014) (quoting *Air France*, 470 U.S. at 399).

T.C.'s argument that the aforementioned language in Article 1 as well as similar language in Article 7 ("a person being prosecuted or who is charged with an offense") is plain and unambiguous fails to persuade.[13]  To support the argument, T.C. inaptly relies, to some degree, on the definition of the noun

---

[13] At the hearing, T.C. focused on the language of Article 1 by noting that Article 7 simply concerns what documents to include in an extradition request.

"charge" as opposed to the verb "charged."  (D. 155, p. 2) (citing "CHARGE, Black's Law Dictionary (12th ed. 2024) ('A *formal* accusation of an offense as a preliminary step to prosecution.')") (emphasis added).  He thereby conflates an accusatory document, i.e., a charge, with the Treaty's language that a person be charged with an offense.  Articles 1 and 7 use the verb "charged."  The definition of the verb "charged" in Black's Law Dictionary (12th ed. 2024) is "[t]o accuse (a person) of an offense."  Charge (vb.), Black's Law Dictionary (12th ed. 2024).  Accordingly, the ordinary meaning of charged therefore equates to accused.

Regardless, no language qualifies or restricts the Article 1 phrase "have been charged with an offense" to "formally charged with an offense," such as indicted or charged in a criminal complaint.  If Türkiye and the United States wished to impose a requirement that the fugitive be "formally charged," they could have included that language in Article 1.  *See Manrique v. Kolc*, 65 F. 4th 1037, 1041-1043 (9th Cir. 2023) (construing Article I of United States-Peru treaty requiring extradition of persons "charged with" extraditable offense as not "limited to formal charges" based on "ordinary meaning of the verb 'charge'" as to "accuse someone of a crime") (citing Charge (vb.), Black's Law

22

Dictionary (11th ed. 2019));[14] s*ee also In the Matter of Assarsson*, 635 F.2d 1237, 1243 (7th Cir. 1980) (If "parties had wished to include" an "additional requirement that a formal document called a charge be produced, they could have so provided."); *accord Aguasvivas*, 984 F.3d at 1060 (quoting this language in *Assarsson* and agreeing with court's holding "and the *rationale*") (emphasis added).

The absence of a formal charging document in the Article 7 list of documents which must accompany an extradition request supports this construction. That list does not even mention "charged", "a charge", or "the charge". Hence, the fact that Türkiye and the United States in the Treaty did not require the extradition file to contain any document regarding a charge in Article 7 reinforces that they did not intend to require the fugitive to be formally charged in Article 1. *See Emami v. U.S. Dist. Ct.*, 834 F.2d 1444, 1448, n.3 (9th Cir. 1987) (rejecting argument that Article 1(1) of treaty required "public charge . . . having been filed against the extraditee" based on reasoning in

---

[14] It is true that the plaintiff in *Manrique* relied on a document issued *after* completion of an investigation ("an *Acusación Fiscal*") as satisfying the Article I "charged with" language. *See id.* at 1041-41. That document preceded issuance of a formal charge by a judge ("an *Orden de Enjuiceamiento*"). Even so, the court's reasoning that "[n]othing in *the language* of the Treaty *unambiguously* requires an *Orden de Enjuiciamiento*, as opposed to an *Acusación Fiscal*, to trigger extradition" applies equally and convincingly to the case at bar. *Id.* at 1042 (emphasis added).

*Assarsson*, 635 F.2d at 1242-1243, including that *Assarsson* treaty did not require extradition file to contain "copy of formal charges"); *accord Assarsson*, 635 F.2d at 1242-1243; S*acirbey v. Guccione*, 589 F.3d 52, 64-65 (2d Cir. 2009) (collecting cases rejecting "'formal charge' arguments").[15]

Relatedly, both the *Assarsson* and *Emami* treaties required certain documents to accompany or support the extradition request. Significantly, like the language in Article 7, such documents included an arrest warrant but did *not* include a document setting forth the charge(s). *See Aguasvivas*, 984 F.3d at 1060.[16] Further, the treaties in *Emami* and *Assarsson* included provisions similar to the language in Article 1 of the Treaty that requires a party to extradite persons who "have been charged with an offense." Article

---

[15] Under Article I of the treaty in *Sacribey*, the parties "agree[d] to deliver up persons who having been charged with or convicted of any of the crimes and offenses specified in [Article II] . . . ." *Sacirbey*, 589 F.3d at 57. Article III of the same treaty set out the documents required to accompany an extradition request, i.e., an arrest warrant and "other evidence upon which such warrant was issued." *Id.* (emphasis omitted). The Treaty between the United States and Türkiye includes similar language, respectively, in Articles 1 and 7. Neither treaty requires the extradition file to include a copy of the charge, such as an indictment or criminal complaint.

[16] The list of the required documents in the *Aguasvivas* treaty included an arrest warrant and "the document setting forth the charges." Extradition Treaty, Dominican Republic-United States, art. 7, § 3(b), Jan. 12, 2015, T.I.A.S. No. 16-1215. Primarily to avoid rendering "the document setting forth the charges" phrase superfluous, the majority rejected the government's argument that the arrest warrant could perform "double duty" by serving as both the arrest warrant and the document setting forth the charges. *Aguasvivas*, 984 F.3d at 1058, 1061-63. This key finding in *Aguasvivas* differs from the issues presently before the court. Nonetheless, the decision remains predictive, most notably because the majority agreed with the holdings and rationale of *Emami* and *Assarsson*.

1 of the treaty in *Emami* imposed the obligation to extradite persons found in a party's territory "who have been charged with an offense."  Treaty of Extradition June 20, 1978, United States-Federal Republic of Germany, 32 U.S.T. 1485, T.I.A.S. No. 9785. Similarly, Article 1 of the treaty in *Assarsson* required each party to extradite "persons found in its territory who have been charged with or convicted of any of the offenses specified in Article II of this Convention committed within the territorial jurisdiction of the other."  Convention on Extradition, Oct. 24, 1961, United States-Sweden, 14 U.S.T. 1845, T.I.A.S. No. 5496.

Indeed, courts have consistently reasoned that, where, as here, a treaty does not require the submission of a charging document to accompany or support an extradition request, formal charges are not required, notwithstanding use of the term "charged" in Article 1 of the treaties at issue.  *See Sacirbey*, 589 F.3d at 64-67; *Emami*, 834 F.2d at 1448, n.3; *Assarsson*, 635 F.2d at 1242-1244; *In re Extradition of Handanovic*, 829 F. Supp. 2d 979, 987 (D. Or. 2011) (rejecting Handanovic's argument that fugitive "cannot be extradited because she has not been 'charged with or convicted of' any crime [under Article 1], but is merely a suspect wanted for investigation" because treaty did "not make extradition

conditional on the filing of formal charges");[17] *see In re Extradition of Sarellano*, 142 F. Supp. 3d 1182, 1187 (W.D. Okla. 2015) (arrest warrant satisfied treaty's Article 1(1) language requiring extradition of persons who "requesting Party have charged with an offense" and list of documents required arrest warrant but not "separate document akin to an indictment or felony information"); *cf. Vitkus v. Blinken*, 79 F.4th 352, 355, 365-367 (4th Cir. 2023) (taking "no issue with Secretary of State's" extradition of "persons not yet criminally charged" under the treaties in *Emami*, *Assarsson*, and *Handanovic* but finding likelihood of success on merits that extradition request failed to comply with *Vitkus* treaty, which required extradition request to include "copy of *the charging document*").[18]

---

[17] In that vein, the court in *Handanovic* observed that, "[s]imilar to the treaties in both *Emami* and *Assarsson*, Article III of the" *Handanovic* treaty did "not list formal charges among the documents required to be produced by the requesting country." *Handanovic*, 829 F. Supp. 2d at 987.

[18] Based on *Vitkus*, T.C. argues that Article 7's omission of a charging document "cannot be determinative in reinterpreting the clear language of Article 1," which establish legal preconditions to extradition, to wit, a charge and/or prosecution. (D. 155). The argument is not convincing. To explain, unlike Article 7, the list of required documents in the *Vitkus* treaty included "a copy of *the charging document*." *Vitkus*, 79 F. 4th at 355. The *Vitkus* court reasoned that *the* required charging document in the extradition file provided the proof "to establish that an individual has been 'charged' with a crime" under Article 1. *Id.* at 363 (citing *Sacirbey*, 589 F.3d at 67). Because the *Vitkus* court took no issue with the extraditions in the cases that did not require the charging document, *see id.* at 365, the decision provides support, perhaps not outcome-determinative, for the extradition of T.C. under the Treaty, which also did not require the charging document.

Two well-recognized extradition principles support the premise that the language of Article 1, construed in conjunction with Article 7, does not transmute "charged" to "formally charged". First, it is not the function of this court to expand or change the obligations imposed on Türkiye by requiring "charged" to mean "formally charged." *See Aguasvivas*, 984 F.3d at 1070 (Lynch, Circuit Judge, concurring in part and dissenting in part) ("[C]ourts cannot expand the obligations of another nation under a treaty.") (quoting *Assarsson*, 635 F.2d at 1241 n.5) (citing *Grin v. Shine*, 187 U.S. 181, 191-192 (1902)).

Second, an extradition court should not review compliance with foreign criminal procedure "except to the limited extent necessary to ensure that the federal extradition statute [section 3184] and the [Treaty] have been satisfied." *McDermott*, 516 F. Supp. 3d at 104; *accord Grin*, 187 U.S. at 190-191 ("[I]t can hardly be expected of us that we should become conversant . . . with the forms of warrants of arrest used [in Russia] for the apprehension of criminals."). This principle is rooted in maintaining "respect for the sovereignty of other nations" and avoiding the "chance of error" in "constru[ing] the law of a country whose legal system is

---

As an aside, T.C.'s argument assumes that "the clear language" in Article 1 bars T.C.'s extradition. For reasons explained, the language is far from clear in this regard.

much different from" the system in this country. *Assarsson*, 635
F.2d at 1244; *accord Emami*, 834 F.2d at 1449 ("refrain[ing] from
interpreting the requirements of German criminal procedure both
out of respect for German sovereignty and . . . chance of erroneous
interpretation"). T.C.'s argument, however, that Türkiye has not
formally charged T.C. but, rather, is only investigating him
entails examining Turkish criminal procedure. Specifically, it
involves a determination that an investigation under Turkish law
is separate and distinct from a person being charged with the
criminal offense.

In a related argument, T.C. relies on the Turkish, as opposed
to the English, version of the Treaty and notes that the Turkish
version uses the word "Kovusturma". Based on "representations by
Turkish counsel," T.C. states that Kovusturma "is the process after
an indictment is filed and accepted by the Turkish court."
Further, so he contends, the Turkish version of the Treaty does
not reference "Sorusturma" which, he represents, refers to the
investigatory stage. From this, T.C. posits that the Treaty allows
the extradition of "individuals that have been charged
('Kovusturma') rather than those that are wanted by investigators
in relation to a pending investigation ('Sorusturma')." The
argument is not convincing.

28

First and foremost, Article 6 of the Treaty requires the supporting documents of an extradition request to be in English. (D. 12, p. 12) ("[S]upporting documents shall be accompanied by certified translations in the language of the Requested Party."); *see Aguasvivas*, 984 F.3d at 1056 n.10 ("We refer only to the official English-language version of the Treaty") (citing, inter alia, article 9 in treaty "requiring all extradition documents to be translated into the language of the 'Requested Party'"). Second, for the reasons discussed herein, the court has concluded that T.C. has been charged with an offense within the meaning of Article 1.

In sum, the term "charged" does not mean formally charged under the plain language of the Treaty. Rather, construed in the generic and more elastic sense, it is synonymous with accused. *See Assarsson*, 635 F.2d at 1242 (term charged in Article 1 phrase "have been charged or convicted of" offenses "is used in the generic sense only to indicate 'accused'"). The issue therefore reduces to whether the extradition record evidences that T.C. has been accused of committing the article 85 offense. It does. The extradition record sufficiently shows that T.C. is accused of committing the article 85 offense in the generic sense and therefore charged with the offense. To that end, the arrest warrant, the prosecutor's report, and other documents in the

extradition file establish that T.C. is accused of committing the article 85 offense.

By way of explanation, the arrest warrant includes the article 85 "Offence Charged Against [T.C.]." Further, the Turkish judge's decision to issue the warrant notes the existence of a "strong suspicion" indicating that T.C. committed the offense and the "concrete evidence" in the file pointing to his commission of the offense. (D. 12, pp. 149-151).

Further still, the Turkish prosecutor provided an exhaustive and detailed report, including a summary of the experts' reports and witness statements. These documents, primarily or exclusively the arrest warrant and the prosecutor's report, sufficiently accused T.C. of committing the article 85 offense. *See Garcia-Guillern v. United States*, 450 F.2d 1189, 1193 n.1 (5th Cir. 1971) (alternatively finding no merit to contention fugitive was not "properly or legally charged with a crime in accordance with the treaty" because arrest warrant had issued and Peruvian court declared fugitive's extradition lawful); *see also Martinez v. United States*, 793 F.3d 533, 543-544 (6th Cir. 2015) (finding Mexican arrest warrant was "charging document: it identifies the offense in the Oaxacan criminal code, sets out the essential facts of the alleged crime, and details the evidentiary basis for the charge").

More, the prosecutor's report meticulously sets out the facts, including the warnings to T.C. to slow down and the excessive speed that he drove the Porsche. The report also recounts T.C. taking the corner at an "extreme high-speed" and losing control of the vehicle. This bears upon T.C. engaging in reckless conduct. As to causation, the prosecutor, after a comprehensive articulation of the facts, determined that T.C. "caused the death of one person and the injury of others by crashing" into the ATV riders standing still on the side of the road. (D. 12, p. 99). The experts' reports, the arrest warrant, and the witnesses' statements add credence to the prosecutor's findings, and the prosecutor summarized them in the report.

Having concluded that T.C. has "been charged with an offense" within the meaning of Article 1, it is not necessary to address whether he is "being prosecuted for" an offense within the meaning of Article 1.

**E.**  **Probable Cause that T.C. Committed the Article 85 Offense**

In order to certify a requested extradition, the court must "deem[] the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention." 18 U.S.C. § 3184; see Smyth, 2024 WL 2093460, at *2. The standard equates to probable cause to believe that T.C. committed the article 85 offense. See Aguasvivas, 984 F.3d at 1062; see also Collins v.

*Loisel*, 259 U.S. 309, 314 (1922) (stating, in context of extradition proceeding, "function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction."); *Kin–Hong*, 110 F.3d at 117 ("purpose of the evidentiary portion of the extradition hearing is to determine whether the United States, on behalf of the requesting government, has produced sufficient evidence to hold the person for trial"). "[P]robable cause is established if a person of ordinary prudence and caution can conscientiously entertain a reasonable belief in the probable guilt of the accused." *Taylor*, 484 F. Supp. 3d at 17 (citing *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975)).

Ample evidence in the extradition file establishes probable cause. As stated by passengers in the Porsche and the driver of the Volvo, T.C. was driving the Porsche. Notably, two passengers in the Porsche warned T.C. to slow down. T.C., however, "did not listen" and the passengers fastened their seat belts "just in case." (D. 70-3, p. 40). As T.C. came to a bend in the two-way road, he turned the corner at an approximate speed of 105 to 111 miles per hour, more than five times above the speed limit. Rounding the bend at this excessive speed, the Porsche, with T.C.

at the wheel, crashed into the three ATVs and the individuals standing still on the side of the road.

Specific to causation of O.M.A.'s death, the mechanical engineer attributed the accident to exceeding the speed limit. The forensic expert concluded that the accident was the primary fault of T.C. and the secondary fault of the ATV riders. Following the post-mortem examination of O.M.A.'s body, the prosecutor and the physician expert reached "the *conclusion*" that O.M.A. died from internal bleeding arising from the impact with the Porsche "he had *due to the accident*." (D. 70-3, p. 4) (emphasis added). Further, and in no uncertain terms, the prosecutor determined that T.C. "*caused the death of one person* and the injury to others by crashing [into] the ATV riders from behind." (D. 70-3, p. 7) (emphasis added). Accepting these findings as true, as the court must, the evidence is overwhelming that T.C. caused the death of O.M.A. *See D'Monte*, 2023 WL 7402921, at *12 ("[A]n extradition magistrate is bound to view submissions of the requesting country as true.").

T.C. does not really challenge the foregoing standard or take issue with the facts set out in the extradition record. Rather, he contends that O.M.A.'s death was not *proximately* caused by his conduct because emergency responders did not take O.M.A. to the nearest hospital, and medical staff at that more-distant hospital

delayed treating O.M.A.  As such, T.C. maintains that probable cause is absent because the responders' conduct was an intervening and superseding act that broke the causal chain, thereby precluding T.C.'s responsibility for commission of the offense.

T.C.'s additional evidence (D. 142-3, 142-4, 142-5), which the court accepts for present purposes, does not materially detract from the existence of probable cause.  This additional evidence indicates that that emergency responders transported O.M.A. to a hospital nearly 22 kilometers from the accident as opposed to a closer facility slightly more than four kilometers from the scene. Once O.M.A. arrived at the more distant hospital, a physician requested blood work at 12:42 a.m. and a sample of O.M.A.'s blood was drawn at 12:52 a.m.  A specialist in the hematology department approved the plasma sample at 1:57 a.m.  The same physician requested a blood bank sample from the blood transfusion center at 12:42 a.m. and a sample was drawn ten minutes later at 12:52 a.m. The sample was not accepted until 4:21 a.m. and not approved by a specialist until 5:54 a.m.  (D. 142-5).

T.C.'s argument fails to persuade for two reasons.  First, and most simply, the record explicitly alleges that T.C. caused O.M.A.'s death.  The prosecutor does not mention "proximate" cause or an "intervening" cause in his report and the extradition record does not reflect any considerations or findings in this regard.

34

Rather, the record simply addresses causation. Second, even if proximate cause was an element of the offense, the record still does not demonstrate that T.C.'s conduct was not the proximate cause of O.M.A.'s death. The responders, for example, may have had wholly justifiable reasons not noted in the record to take the victim to a hospital located further away, e.g., the availability of superior medical care there or the unavailability of adequate medical care at a closer situated facility. Moreover, whether the actions of the first responders were a superseding cause of O.M.A.'s death would be a factual and legal issue for the Turkish court to resolve.

As a final matter, T.C. maintains that the submissions by Türkiye omitted that he is a United States citizen. This, in turn, purportedly precluded the United States from assessing whether it should exercise its discretion under Article 4 and refuse to extradite T.C.[19]  T.C. is mistaken on this point; the first page of the extradition file identifies T.C.'s place of birth as "EXETER/USA" as does a government record in the extradition file. (D. 70-3, pp. 3, 60).  Similarly, the arrest warrant identifies

---

[19] Article 4 provides that neither the United States nor Türkiye "shall be bound to extradite its own nationals."  (D. 12, p. 11).

T.C.'s birthplace as "ER/USA."  (D. 70-3, p. 53).  As such, this argument has no force.

## 2.  <u>Section 3184</u>

T.C. argues that the "charging" and/or "so charged" language in section 3184 bars extradition based on investigative needs.  He maintains that the clear language of section 3184, similar to the language in Article 1, refers to a "legal precondition" or condition precedent of "a charge of prosecution." (D. 155).  The argument lacks merit.

Placing the "charging" and "so charged" words in context, section 3184 states:

> Whenever there is a treaty . . . any magistrate judge . . . may, *upon complaint* made under oath, *charging* any person found within his jurisdiction, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty . . ., issue his warrant for the apprehension of the person *so charged*, that he may be brought before            such"            magistrate            judge.

18 U.S.C. § 3184 (emphasis added).  T.C. presumes that the "charge" at issue here refers to a charge in Türkiye but that is not correct.  Rather, "charging" and "so charged" refer to the federal extradition complaint filed in Florida seeking the arrest warrant.  *See e.g., Snider v. Seung Lee*, 584 F.3d 193, 200 (4th Cir. 2009) (dicta quoting section 3184 and inserting "the extradition

complaint" in brackets after "so charged").[20]    More precisely, under the language of section 3184, it is the extradition "complaint made under oath" that is "charging" the person with having committed in the territory of the foreign government a crime covered by the Treaty.  *See Grin*, 187 U.S. at 185–86; *see also Snider*, 584 F.3d at 200.  Interpreting a predecessor statute with similar pertinent language,[21] the Court in *Grin* concurred that the language refers to the complaint filed in the United States district court.  Simply put, it is the extradition complaint under oath filed in Florida that is "charging" the crime.

In conclusion, the court finds that the five elements to certify T.C.'s extradition have been met.  Certification to the Secretary of State of T.C.'s extradition is therefore appropriate.

---

[20] To provide more detail, the Fourth Circuit in *Snider* stated that:

> The arrest of the citizen in the United States is made on a warrant issued after the complaint of extradition is filed to compel the citizen to attend the extradition hearing.  *See* 18 U.S.C. § 3184 (authorizing "warrant for the apprehension of the person so charged [in the extradition complaint], that he may be brought before such [judicial officer], to the end that the evidence of criminality may be heard and considered [in the extradition proceeding]"); *see generally Mironescu*, 480 F.3d at 665–66.

*Snider*, 584 F.3d at 200.

[21] The language states that, a judge may, "upon complaint made under oath, charging any person found" in any state or district "with having committed within the jurisdiction of" the "foreign government any of the crimes provided for by [the] treaty or convention," issue a "warrant of apprehension of the person so charged."  *Grin*, 187 U.S. at 186.

## V.  CONCLUSION

The relator's motion to dismiss (D. 87) is **DENIED**. Based on the foregoing, this matter is certified to the Secretary of State in order that a warrant may issue, upon the requisition of the proper authorities in Türkiye, for the surrender of T.C. on the charge of causing reckless killing and injury under article 85/2 of the Criminal Code of Türkiye, according to the provisions of the Treaty between the United States and Türkiye.

No later than seven days after the date of this decision, the government shall file a proposed extradition certification and order of commitment.

The court will then order that the clerk of court forward a certified copy of this Extradition Certification and Order of Commitment, together with a copy of all the evidence taken before this court, to the Secretary of State, Department of State, to the attention of the Office of the Legal Adviser.

T.C. shall remain in the custody of the U.S. Marshal for this District, to be held pending final disposition of this matter by the Secretary of State and pending his surrender to the government of Türkiye.

/s/ Donald L. Cabell
DONALD L. CABELL, Ch. U.S.M.J.

DATED:  February 11, 2025

38